PEABODY (MASON v.). See Case No. 9,250.

## Case No. 10,869.

### PEABODY v. PROCEEDS OF TWENTY-EIGHT BAGS OF COTTON.

[2 Am. Jur. 119.]

District Court, D. Massachusetts. March Term, 1829.

#### ADMIRALTY JURISDICTION—DERELICT PROPERTY—UNCLAIMED PROCEEDS—RIGHTS OF SOVEREIGN.

[1. The rules and usages of nations in regard to the final disposition of the proceeds of property found derelict at sea, and which are not claimed by any owner, are made a portion of our maritime law by the provisions of the constitution of the United States, and the laws passed pursuant thereto, giving to the national courts power to adjudge, award, and decree respecting causes of admiralty and maritime jurisdiction.]

[2. Surplus proceeds of derelict property found at sea, remaining in the registry of the court

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

for many years, after awarding to the salvors a proper compensation, will not, in the absence of statute, be awarded also to the salvors, nor will it be ordered to be paid into the treasury of the state, into which the property was brought, but the superior right is in the government of the United States, and the money will be ordered to be paid into the treasury thereof.]

Samuel Peabody and others, libellants of the proceeds of twenty-eight bags of cotton.

This libel was filed by Samuel Peabody, one of the surviving owners of the schooner Equality, in behalf of himself and another owner, and the representatives of a third owner, who had also been master of the vessel. The libel stated that August 27, 1806, the schooner found twenty-eight bags of cotton adrift at sea, abandoned by the owners, which the master took on board and carried into Salem; that the owners of the cotton were then and had ever since been unknown to the libellant; that a libel was filed in the district court by the salvors for salvage; that the court ordered the cotton to be sold, and adjudged that, after payment of costs, expenses, and duties, one moiety of the residue should be paid to the salvors, in the following proportions, viz. one-third to the owners of the schooner, one-third to the master, and one-third to the crew, and that the other moiety should remain subject to the further order of the court. The libel then averred that the last-mentioned moiety had remained in the court until the present time, awaiting such further order; and alleged that it had not been claimed by or allowed to any persons since that time, and that, from the great length of time which had elapsed since the cotton was found, more than twenty-two years, the libellant had good reason to believe, and did verily believe, that it would not be claimed by any other persons than himself and the other parties interested; and that he is advised that he and they are lawfully entitled to the said moiety, which he prayed should be decreed and paid over to him, for himself and the other parties interested.

Andrew Dunlap, Dist. Atty., appeared and interposed a claim for the said remaining proceeds, as the right of the United States, denying the right of the libellants, and praying that the proceeds should be paid to the treasurer of the United States. The facts stated in the libel were not disputed.

J. Pickering, for libellants.
Andrew Dunlap, Dist. Atty., for the United States.

Mr. Pickering. The libellants claim the proceeds of the property in question as a derelict. It was found by them, on the high seas, twenty-two years ago; was duly sold under an order of this court, publicly advertised in the newspapers, and no owner has ever appeared. To constitute a case of derelict, it is not necessary, as by the civil law, that the goods should be voluntarily abandoned, without any further claim of property

in them. It is sufficient that they are found deserted or abandoned upon the seas, whether it arose from accident or necessity or voluntary dereliction. Rowe v. The Brig [Case No. 12,093]. It is true that the high court of admiralty in England has sometimes held that the abandonment must be made without hope of recovery. But it is observed by Mr. Justice Story, in the case just cited, that Lord Stowell has silently retracted that opinion (in the case of The Lord Nelson, 1 Edw. Adm. 79, and The Blendenhall, 1 Dod. 419), and that "certainly it is not recognized as the doctrine of this country." The learned judge then goes on to adopt the definition of Sir Leoline Jenkins, that derelicts are "boats or other vessels forsaken or found on the seas without any person in them." This principle is recognized in Moll. de J. Mar. bk. 2, c. 5, § 4. The remarks here made are also applicable to the opinions expressed in the case of Taylor v. The Cato [Case No. 13,786], where the court adopted the original rule of Lord Stowell; and also to the case of Wilkie v. Two Hundred and Five Boxes of Sugar [Id. 17,662]. Upon the facts proved in the present case, then, there can be no doubt that this is a case of "derelict," according to the modern application of that term. The claim to derelict property rests upon the general principles of natural law and the positive regulations of states. According to the principles of natural law, derelict property, or property found, whose owner is unknown, belongs wholly to the finder. Gro. De Jure B. lib. ii, c. 8, § 7; Puff. Law Nat. lib. 4, c. 6, § 13, and Barbeyrac's note 2; Enc. Meth. Jur.; 1 Bl. Comm. 295, 296; 2 Bl. Comm. 9, 402; 2 Wood. Lect. 391. The elementary writers, it is true, admit that this principle of natural law may be modified by express regulations; and several European nations have in fact established different rules, of which France, in particular, affords an example in Code Civ., art. 716. But the rules of different states have always materially differed from each other, as well as from the original rules adopted in the civil law. Groenewegen de Legib. Abrogat. p. 23.

The United States, however, have made no such regulation. As a confederacy, having no powers except such as are expressly surrendered by the several states (among which powers this is not included), they could not establish any regulation on this subject, so far as to affect the rights of the individual citizen who should happen to be the finder of property lost or abandoned. The right to dispose of such property, so far as respects the finder, must still belong to the sovereignty of his particular state. So far as regards foreign nations, it may be admitted that the United States may take cognizance of these cases as matters of admiralty or maritime jurisdiction; and that property found derelict on the ocean, the common highway of nations, should be adjudicated upon by the United States courts, which are the only tribunals authorized to decide such questions as against foreign states. But the ultimate right of property, as between individual citizens of the United States, must depend upon the laws of the individual states, to which such power is reserved by the principles of the confederacy.

If the property in question had been found upon the territory of Massachusetts, it would, on principles of natural law, belong to the finder; and the United States could make no claim to it; but the state, as a sovereign state, has provided by an ancient law that, after the lapse of a year and a day, the property of the original owner should be considered as devested, and disposed of in a specific mode. In England, goods found upon the land have been adjudged exclusively to the finder; as in the case of Armory v. Delamirie, 1 Strange, 505, where a chimney-sweeper's boy found a valuable jewel, and the court held that he was entitled to it against all the world, until the original owner appeared to claim it. Christian's note on 1 Bl. Comm. 299. Now it is difficult to perceive any distinction in principle, so far as regards the original owner and the finder, between property found on land and on the high seas. But it is suggested that the government of the United States should hold it, in preference to the finder, in order that it may be in the power of the owner to recover it; as the finder or his representatives may forever remain unknown, but the government can always be found. We say, in reply, that the government may deliver it to the finder upon adequate security, as in many other cases, if it has a right to retain the property at all.

But here again the question recurs, whether this is a right of the general government of the United States or of the particular states. We should further ask, if the government has the right to retain the property, for how long a time can it be held? Does the government acquire an absolute and perpetual right as against the finder? On the contrary, there must be a reasonable limitation in this as in all other cases. If, by our laws a possession of forty years would bar a claim even to real estate, it should seem that twenty-two years ought to bar any claim of the original owner in the present case. By the laws of Europe, which have been referred to respecting wrecks, the short period of a year and a day was a good bar against all the world; and by our state laws the same period is a good bar in the case of strays and goods lost on the land. In the case of Wilkie v. Two Hundred and Five Boxes of Sugar [Case No. 17,662], it is true that the court intimates that no length of time would be a bar; but the language there used must be taken with reference to the case then under consideration, in which, however, no very great length of time had elapsed.

Again, it is said. we are not to presume that the owner would have abandoned valuable property; but it may, on the other hand, be replied that it cannot be presumed he would have remained silent for twenty-three years, and give no public notice of his loss, which notice is not here pretended. The voluntary abandonment of property, like the relinquishment of debts, is not an uncommon thing; and the nonappearance of an owner, after such a length of time, is the strongest evidence of such abandonment. To make a case of derelict, however, it is not necessary that no owner should afterwards appear. The Aquila, 1 C. Rob. Adm. 40. In all the cases cited for the United States, either a very short time had elapsed between the abandonment and the adjudication, or a claim was made by a known owner immediately. If, then, there is any such thing as a limitation to claims of owners in these cases, the present is as strong a case as can be found for applying such limitation. It is also argued that the United States can make this claim, as successor to the prerogatives of the king of England, upon the authority of 3 Dane, Abr. 157. But in the same work it is said that there are numerous instances in which this doctrine has been held not applicable to the American colonies; and then we contend that the present is one of the latter cases, and that whatever rights of that kind the several states may have there is no such prerogative in the federal government. Among other instances, the United States have not claimed anything of the royal prerogative as to wrecks, but these have been considered as under the jurisdiction of the several states. If, therefore, the present claim of the libellants rested upon the law of wrecked property, it would still be the right of the finder to have it disposed of independently of any claim of the United States.

It is further objected that the claim of the whole property is one of a novel impression. But in the case of McDonough v. The Mary Ford, 3 Dall. [3 U. S.] 188, the supreme court of the United States intimate a doubt whether on the principles of abandonment they ought not to decree the whole of the property there in question to the American libellants; but, as the parties had not appealed from the decision of the lower court on that point, it could not be taken notice of on the appeal.

Mr. Dunlap argued that the claim of the libellants rested upon the principles of the title by occupancy, as described by the ethical and legal writers. The case at bar was, he admitted, one which at first view appeared strongly in favor of the libellants upon equitable principles, yet it must be decided by general rules of law; and, when the cause was examined to the foundation, it would, he believed, be found to rest upon those barbarous principles of the ancient law of nations in the iron age, by which a title was asserted to shipwrecked property, to the exclusion of the right of the unfortunate owners. The title by occupancy, except in the case of newly-discovered countries, no longer exists; it is totally unsuited to the present state of society, as its assertion must constantly tend to the violation of its peace. The laws of all civilized nations provide against the assertion of this title, which, however equitable it may appear in the elegant essays of ingenious and fanciful ethical and legal authors, is utterly inconsistent with the harmony of any well regulated society. Even the most learned authors, in their speculations on this subject, differ in their nice and scholastic hypotheses; Grotius and Puffendorf resting the right upon the foundation of an implied assent of all mankind that the first occupant of property should become the owner, and Barbeyrac and Mr. Locke denying any such assent, and founding the right upon the fact that the occupant has, by seizing the property, joined his labor to it, and thereby made it his own. It would seem that, when such learned doctors of the law disagree, the dispute must be about a fanciful matter, having no practical applicability to the common affairs of life or the general rules of human conduct. 2 Bl. Comm. c. 1. Burlamaqui, in his Principles of Natural Law, considers the state of property as wholly an "adventitious state," created by civil society, and restrained and regulated by its ordinances. Burlam. Nat. Law, c. 4, § 8. The right of inheritance and the right to dispose of property by will, which cannot be satisfactorily sustained by natural law, whatever may be the common notions implanted by education, rest upon this supposition that the permanent right to property is "an adventitious state"; and therefore Blackstone, in his second book, c. 14, has said that "all rules of succession to estates are creatures of the civil polity and juris positivi merely." The title by occupancy to lands never existed in England but in a few cases of rare occurrence, and now it is in those cases destroyed by statute regulations. 2 Bl. Comm. c. 16. It was therefore contended that the libel in the present case could not be supported upon the notions which had been proclaimed in former days relative to the title by occupancy.

As to the law relied on respecting property derelict, it was contended that there was no such thing at present in the sense of the word "derelict" in the civil law, and the ancient law writers,— a voluntary abandonment, without any further claim to property. This never happens in the present avaricious or needy age, unless in trifling cases, to which the legal maxim, "De minimis non curat lex," applies, or in cases of insanity, where the acts of the party

are null and void, and guardians will be appointed to recover and preserve the property. Gifts are often made from various honorable and generous considerations, but a gift does not create a derelict, for the donee, not the first finder, has the title. The modern description of property derelict is given by Sir Leoline Jenkins, the great admiralty judge of England, and has been adopted by the learned judge of the circuit court of the United States for this circuit. It is defined: "Property forsaken when the hope of recovery exists, although there may be no intention of attempting to recover it." Sir Leoline Jenkins' Works, p. 89; Rowe v. The Brig [Case No. 12,093]. Express dereliction, in the sense of the civil law, never applied to the case of goods thrown overboard in a storm for the preservation of life or property. In Justinian's Institute (Cooper's Ed. lib. 2, tit. 1, § 47) it is ordained: "But the law is not so in respect of things thrown overboard in a storm to lighten a vessel, for they remain the property of the owners, seeing it is evident they were not thrown away through dislike, but that persons in the ship might avoid the dangers of the sea." The law of England, the common law, never recognised any such thing as a derelict in the civil-law sense. It is said in the Doctor and Student (Dialogue 2, c. 31): "There is no such law in the realm of goods forsaken." It was therefore contended that there was nothing in the doctrine respecting derelicts to sustain the libel, and repel the claim of the United States for this money.

The chief legal authorities in support of the claim of the libellants are certain passages in Blackstone. In the Commentaries (volume 1, p. 293) it is said, if property "be found in the sea or upon the earth, it doth not belong to the king, but the finder, if no owner appears"; and in the second volume of the same work (page 402) it is laid down: "Whatever movables are found upon the surface of the earth, or in the sea, and are unclaimed by any owner, are supposed to be abandoned by the last proprietor, and as such are returned into the common stock and mass of things; and therefore they belong, as in a state of nature, to the first occupant or fortunate finder, unless they fall within the description of waifs, or estrays, or wreck, or hidden treasure, for these, we have formerly seen, are vested by law in the king." It is evident that Blackstone is speaking of the fanciful case of voluntary abandonment as a foundation for the title by occupancy, for he rests the right of the finder entirely upon the supposition of voluntary abandonment by the original owner. Besides, the case of wreck is exempted from the operation of this theoretic rule. In a note to article 32 of the Law of Oleron, the right of the finder to goods thrown overboard in a storm is denied, for the owner, as the sea drives everything to the land, has still the hope of recovering

such property. It is said to be "non in derelicto sed in deperdito." The right of the finder is only in cases of "abandonment through contempt;" that is, voluntary abandonment, to which Blackstone, in the remarks above cited, alludes. Again, it is held by the court, in the case of Warder v. La Belle Creole [Case No. 17,165], that "the cases of dereliction, in which the maxim of occupantis fiunt derelicta is founded, generally run on the principle of a voluntary abandonment by the owner with his free consent, and not on such a relinquishment as force, necessity, or danger compels." In this case, had there been a voluntary abandonment, and a case for the application of the principles laid down in Blackstone, the whole property would have been decreed to the libellants some twenty years since, when the property found was libelled, and a moiety only decreed for salvage. This distinction, which is maintained in argument on the part of the United States, is believed to be a solid one; and Blackstone himself recognises it, in his remarks upon treasure trove or hidden treasure, and bona fide vacantia, or goods found without any known owner. In his Commentaries (volume 1, p. 293) he says that "hidden treasure" belongs to the king, because by the hiding the owner has shown that it was not his intention to renounce his property. In the same volume (page 298) he says that bona vacantia, or goods in which no one can claim a property, by the law of nature belonged to the finder, but in settling the modern constitutions of Europe, to avoid strife, were vested in the sovereign power. Now, if hidden treasure never belonged to the finder, and bona vacantia by the law of nature did, the difference was because in the former case there was no voluntary abandonment, and in the latter case a voluntary abandonment was supposed. Here, then, Blackstone himself makes the distinction between the case of goods lost by necessity, and voluntary abandonment, and places the right of a finder upon the only ground which can support it, a voluntary renunciation by the owner of his property, which has been shown not to be in the case, when goods are thrown or washed overboard in a storm; that is, in the barbarous dialect of the ancient law, goods jetsam or flotsam. Were Blackstone to be understood otherwise, he would be grossly inconsistent; for he asserts, in volume 1, p. 298, that bona vacantia belong to the king, "because they are goods in which no one else can claim property." Now, in volume 1, p. 295, he says: "If anything be found in the sea or upon the earth, it doth not belong to the king, but the finder, if no owner appears." This inconsistency is the subject of remark by Mr. Christian in his notes on Blackstone's Commentaries, and it can only be reconciled by supposing, as has been contended in the argument, that Blackstone intended to allow the title by occupancy, only in the imaginary cases of voluntary renunciation by an owner of his property to the

first fortunate finder. It is apparent that this was his idea, from the passage in volume 2, p. 402, in which the right of the finder to movables which are "found upon the surface of the earth or in the sea, and are unclaimed by any owner," is put upon the ground that they "are supposed to be abandoned by the last proprietor, and as such returned into the common stock and mass of things." From this view of the subject, it was contended that the passages in Blackstone did not apply to the case of this libel, or sustain the claim which it propounded.

What is the definition and history of this title by occupancy? In relation to lands, it is defined in 2 Bl. Comm. p. 258, and in Co. Litt. 41b, Blackstone says: "Occupancy is the taking possession of those things which before belonged to nobody." Surely this could not have been the case with this cotton found in bales on the ocean, with marks and numbers, the indicia of the ownership of the unfortunate and unknown owner. Lord Coke says, where an estate is granted for the life of another man, and the tenant dies, he who first enters upon the land shall hold it during the continuance of the estate,—during the life of the person for whose life it was granted; and so where a tenant for life, in curtesy, in dower, grants over his or her estate and the grantee dieth, he who first enters shall hold the estate during the continuance of it, "because his title is by his first occupation." But, against the sovereign power, this title never could be set up. "Against the king there shall be no occupant," says Coke; "against the king there shall be no prior occupant," echoes Blackstone. It is manifest, therefore, that the title by occupancy, when it existed, was never suffered to prevail against the sovereign power, and consequently in this case cannot be sustained against the United States. But the title by occupancy has been long since abolished, as inconsistent with the peace and refinement of civilized society, and as a title by brute force, instead of law. It is now entirely done away by St. 29 Car. II. c. 3, and 14 Geo. II. c. 20. The note by Hargrave and Butler to the passage cited from Co. Litt. note 241, was referred to, as containing the ancient law and the modern law upon this subject. The case in 1 Strange, 505, was relied upon by the libellants. This case was where a chimney-sweeper's boy found a diamond ring, and a jeweller, to whom it was shown, took it from him, and substituted in the place of the jewel a stone of inferior value; it was ruled that the boy might sustain an action against the jeweller, and recover the value of the richest jewel which could be found to fit the socket in the ring, as the jeweller did not return the diamond. But this was a case between two individuals, in which no questions of sovereignty arose, in which no flowers nor thorns of prerogative spring up; and, whenever it is cited in the books, it is merely to establish the reasonable doctrine of the common law, that a mere possessor of property

may maintain an action of trespass against a mere wrongdoer, who disturbs his possession. Williams' notes to 2 Saund. 47, were referred to.

In England and in this country,—certainly in New England,—the analogies of law are against the claim of property by the libellants because they were the finders, and in favor of the claim of the government or sovereign power. Take, for instance, the law respecting estrays: "Estrays are such valuable animals as are found wandering in any manor or lordship, and no man knoweth the owner of them, in which case the law gives them to the king." 1 Bl. Comm. 296. Christian, in his note to this passage, assigns the true reason: "The law is probably founded upon general policy," as it "lessens the temptation to theft," and furnishes the owner with "the best chance of having his property restored to him." In Massachusetts, as early as 1698, it was ordained by the colony laws that "of lost goods whereof the owner is not known, public notice should be given, the goods appraised, and after a year, if no owner appeared, one half of the net proceeds disposed of to the finder for salvage, and the other half to public use." The same law continues, with modifications, to this day in Massachusetts. Laws Mass. Feb. 13, 1789; Id. June 13, 1815. A similar law exists in New Hampshire and in Maine. Acts N. H. Feb. 9, 1791; St. Me. 1821, c. 130, pp. 573–575; 3 Dane, Dig. Am. Law, c. 79.

What is the law of nations on this subject? The laws of the great commercial nations have certainly been against the claim of the libellants, and in favor of the principle of the claim of the United States. By the imperial constitutions of Rome, by the civil law, the right to property found shipwrecked was vested in the sovereign power. The edict of the first Christian emperor, Constantine, which has sometimes been attributed to one of the Antonines, shows it. Before this edict the sovereign, jure gentium, became entitled to shipwrecked goods, and this was the Rhodian law. The edict of Constantine (Leg. 1, lib. 11, De Naufrag.), declares: "What right has the sovereign to another's calamity, so that it should hunt after gain in such a woful case as this?" Now the right of the emperor certainly was not yielded in favor of the finder, that he might "hunt after gain in such a woful case," but it was yielded only in favor of the owner, and, if he did not come and claim in a year and a day, the proceeds of the goods went into the exchequer. By the decree of the Emperor Adrian, if anything was found within the imperial domain, half appertained to the finder, and the other half to the emperor. Just. Inst. lib. 2, tit. 1, § 39. In Laws Oleron, art. 30, it is enjoined that in case of shipwreck and goods found floating upon the sea, a salvage shall be paid to the finders, and the property shall be preserved for the owners a year; if they did not appear, the

goods were to be sold, and the money arising therefrom was to be given "among the poor" and for portions to poor maids and other "charitable uses." All this was ordered under the penalty of the malediction of "our mother, the holy church," whose battles in the crusades Richard I., the law giver at Oleron, had been piously fighting against those who were guilty of the sin of believing in their church, in whose bosom they had been educated.

In Dom. Civ. Law, bk. 1, tit. 8, § 2, we find the ancient law of France on this subject. It is laid down, with respect to shipwrecked goods found, that, if the owner do not appear within the given time, "the prince has a right in them, as he has in the kind of vacant goods." It appears, by Valin's Commentaries upon the Ordinance of the Marine of Louis XIV., that when shipwrecked property was found, and no owner appeared within a year and a day, it was ordained, by Francis I. of France, that one-third should be allowed to the salvors, one-third to the admiral, and one-third went to the king; and Louis XIV. placed under the protection of the crown all property saved from shipwreck. Valin. Ord. de la Mar. liv. 4, tit. 9, De Naufrages, etc. In Locc. De Jure Mar., is found the general law of the northern nations of Europe on this important subject. This writer says, respecting shipwrecked property found derelict or without an owner, that the larger part belonged to the national treasury, and a lesser portion was allowed to the salvors for their care and labor in preserving the property. This he speaks of as agreeable to equity and the laws of nations. Locc. lib. 1, c. 7, De Naufragiis, § 10. Selden, in his celebrated work De Dominio Maris, lib. 1, c. 24, mentions the right of the sovereign power to shipwrecked goods as the acknowledged modern law of nations. Bracton, also, though an early English common-law writer, has the reputation of having been well acquainted with the civil law and the law of nations, and he says that derelict property or property without an owner, as wrecked property, belongs to the treasury; and things of this nature, which formerly, by the law of nature, belonged to the finder, now belong, by the law of nations, to the sovereign power. Bract. lib. 1, c. 12. It would seem, therefore, to be clear that the general law of nations was against the libellants' claim, and in favor of that set up in this case, in favor of the sovereign power —the United States.

The law of England concurs with the general law of nations in relation to this subject. In Sir Henry Constable's Case, 5 Coke, 106, the court of king's bench say "that the king should have flotsam, jetsam, and ligan, where the ship perishes, or where the owner of the goods is not known." In the Doctor and Student it has been shown to be declared that there is "no such law in the realm as of goods forsaken," to divest the title of the owner in favor of the finder. By St. Westm. c. 4, passed in the third year of Edw. I., the English Justinian, it was provided, in case of wreck, that the goods were not to be forfeited either to the finder or king, "where a man, a cat, or a dog escaped out of the ship"; and, if the owner came and claimed within a year and a day, the property should be delivered to him by the king's sheriff, bailiff, or coroner; but, if no owner appeared, they remained to the crown. Lord Coke, in his commentary upon this statute, states that an opinion had been holden that, by the common law, "goods wrecked upon the sea were forfeited to the king." 2 Inst. 166. This statute was grounded on the law of Oleron, the humane principles of which did not extend to "Turks or other enemies of the Catholic faith," for every man was allowed to deal with such as rogues, and despoil them of their goods, without any punishment for so doing, as was ordained by "that valiant and religious prince" (as he is called in Molloy), Richard I., at Oleron, on his return from a crusade. Laws Oleron, art. 47; 1 Moll. de Jure Mar. c. 5; Beawes, 158; Weskett, 488; Sir Leoline Jenkins' Life, p. 88; Malyne, 120; 5 Burrows, 2738,—were referred to as authorities clearly against the finder's right, and in favor of the right of the sovereign power. The case of The Aquila, 1 C. Rob. Adm. 37, was referred to, as decisive of this question in England, in which case Sir William Scott held the doctrine that "in a state of civil society, although property may be acquired by occupancy, it is not necessarily acquired to the occupant himself, for the regulations of the state may have made alterations on the subject, and may, for reasons of public peace and policy, have appropriated it to other purposes, as, for instance, to the state itself." He further says: "I consider it to be the general rule of civilized countries that what is found derelict on the seas is acquired beneficially for the sovereign, if no owner appears"; and again: "In England this right is as firmly established as any one prerogative of the crown." A manuscript copy of proceedings in the high court of admiralty in England, in the possession of the district judge of Massachusetts, was referred to, showing that, in such cases, after a year and a day from the time of the decree for salvage, proclamation is made upon the royal exchange for the owner to come in and receive the residue in court, and upon his default the money is paid, under a decree of the court, into the exchequer.

If by the law of nations generally, and particularly the law of Great Britain, the right to this property is vested in the sovereign power, as a droit of admiralty, it is contended that in this country it is vested in the government of the United States. The colonies never had any droits of admiralty, for, from the nature of their relations to the parent country, they had nothing to do with the ques-

tions of peace and war, except with the Indians. The admiralty powers must necessarily be annexed to the national sovereignty, whose prerogative it was to decide questions of peace and war. The admiralty courts, in which questions arising under the laws of nations (for the correct decision of which the sovereign power is responsible to the world and to posterity), must have been and were established, and the judges appointed, by the crown, the sovereign over the colonies. Raw. Const. U. S. p. 18. In 3 Dane, Dig. Am. Law, 137, it is said: "Yet the king considered himself as entitled to treasure-trove, estrays, wrecks, etc., in America, if he should see fit to claim them; for he granted these, in 1639, to Sir Ferdinando Gorges, in the province of Maine; and as the king judged he had them to grant there, no doubt he held he had them to grant, if he saw fit, in adjoining British colonies in America." Also, in the same volume (page 140), the author further says: "On the whole, examining the English and colony laws, it will appear that of property found in the colonies, in or upon the land, the king only had wrecks of the sea cast on the shore; and, of goods or property found in or upon the high seas, he had jetsam, or goods cast overboard and sunk under water; flotsam, or goods afloat on the surface; and ligan, or goods sunk, but tied to buoys, etc., to save them; and to wrecks at sea. Now, in the United States, to these goods, now found on the high seas, and brought into them by the finder, and no owner known, the United States now succeed." [The Adventure] 8 Cranch [12 U. S.] 221, was referred to to establish the right of the United States to droits of admiralty, and also Const. U. S. art. 3, § 2, vesting in the government of the United States jurisdiction "in all cases of admiralty and maritime jurisdiction."

In this case, the great length of time which has elapsed since the property was found, without any claim of ownership, is relied upon by the libellants. But this does not strengthen their claim, for no length of time can divest the owner's right. In Wilkie v. Two Hundred and Five Boxes of Sugar [supra], the judge of the district court of South Carolina held that length of time gave no "better right" to finders than "accrued on the day subsequent to abandonment."

The claim of the libellants is one of a new impression,—perhaps the first of the kind ever made in an admiralty court; and to it the remark of Parker, the learned chief justice of the supreme judicial court of Massachusetts, in 17 Mass. 172, in another case, may be well applied: "This case must be considered an experiment to ascertain whether, under such a state of facts, an action can be maintained; no authority in favor of it has been found by the plaintiff's counsel, and this, of itself, is pretty decisive against the action."

It is not denied, but, on the contrary, is admitted, that the whole property saved may sometimes be decreed. But this can only be done in those cases where, in the opinion of the court in which the claim for salvage is preferred, the whole property would constitute but a fair compensation for the service rendered. Upon this principle it is that divers have usually the whole property saved allowed to them; and those who recovered the plate, in 1687, lost fifty years before, near the Bahama Bank, and whose case is related in 1 Moll. de Jure Mar. c. 5, were allowed the whole. But, in the case at bar, a moiety only was allowed, being, in the opinion of the court, a fair, full, and liberal compensation for the service rendered.

The reason why the law of nations vests in sovereign power the right to property so situated is a plain one,—in order that the original owner may be enabled to recover his property,—the sensible reason assigned by Christian in his notes to Blackstone's Commentaries, why estrays are in England the right of the crown. If property of this nature should, in addition to the liberal salvage always awarded, be distributed among the finders, when the owners might appear it could seldom be recovered; for the finders might be dead, and their estates administered upon, or insolvent, and unable to respond. But the government never dies, and is never insolvent; and to suppose that it would refuse to restore to an unfortunate owner his property, claimed at any distance of time, would be distrusting the humanity and justice of the times, the integrity of the people, and the honor of the government. Our government—and, it is to be hoped, that of any civilized people—would say, in such a case, with Constantine, "What right has the sovereign in another's calamity?"

DAVIS, District Judge. The libellants, owners of the schooner Equality, claim a sum remaining in court, part of the proceeds of twenty-eight bags of cotton, taken up at sea, on the 28th of August, 1806, by John Peabody, master of said schooner, and his crew, in her passage from Baltimore to Salem, and which were brought by them into the last-mentioned port. On the libel for salvage, in this court, the goods thus saved were ordered to be sold for the benefit of all concerned, and one net moiety of the proceeds of sale was decreed to the salvors, the residue to remain in court, subject to further order. By a subsequent order, part of the balance was directed to be paid to the salvors, so as to make their whole compensation equal to one-half the gross amount of the property saved. From the length of time elapsed since that decree, it is urged, in behalf of the libellants, that there is no probability of any claim being made, by the original owners, or by any person in their behalf or stead, and they pray that the sum thus remaining in court, being two hundred and twenty-five dollars and eighty-five cents, may be decreed to them, as their lawful right under the alleged circumstances of the case. This application is read-

ily entertained by the court, that a final and correct disposal of these proceeds may be made, and that a rule may be settled, in reference to some other balances remaining in the registry of the court, under similar circumstances.

There having been no decision, within my knowledge, respecting the disposal of such unclaimed property, in the courts of the United States, notice of this application was directed to be given to the district attorney, who has presented a claim in behalf of the United States. The points incident to the question have been very fully and ably argued by the counsel on both sides, and the court has listened, with satisfaction and improvement, to their elaborate arguments, supported or illustrated by numerous authorities, which their diligent and thorough examination has enabled them to produce.

In an examination of the questions occurring, respecting lost property, and of the rights and duties of the finder, we perceive a considerable diversity of opinion among elementary writers, and a variance in the practical rules and methods adopted by different nations; with features, in some instances, of singular scrupulosity or refinement. The Byblians, says Aelian, if they discover any lost article in the road, will not take it up, considering that such an act would be theft. Var. Hist. iv. I. According to the remark of a commentator on this passage, a similar sentiment prevailed in other ancient nations. Plato enjoins the same strict forbearance, in his book upon Laws,—"quae non deposuisti, ne tollas," was the doctrine of those ancient Puritans. We shall all readily agree with Puffendorf, in his remark on the doctrine, "nimia, sine dubio, scrupulositas." We see a tincture of these views in the Roman law. The distinctions are so nice, in the specification of circumstances and motives justifying or excusing the meddling with property casually lost, and by which the reproach and penalty of theft might be avoided, that he would be thought to act most prudently, who should leave it untouched. The sage Ulpian admits, that property derelict, or judged to be derelict, may be taken up, but it must be with a pure and sincere intention of restoring it to the owner, and without any mercenary motive or expectation of reward. "Quid ergo, si sugerga (id est, inventionis proemia) quae dicunt, petat? Nec hit, videtur fortum facere, etsi non probe petat aliquid." Dig. lib. 47, tit. 2, 1. 43. The discriminating Greeks, in reference to what is comprehended under our term, "salvage," employed, also, another word, μμηνυτρον—reward for discovery or for giving information. These specimens of their vocabulary, and the manner in which Ulpian introduces ευρετρμ, would seem to indicate, that the Grecian law did not correspond with the maxims of Roman jurisprudence, in regard to the rights and duties of a finder of lost goods. The kind and neighborly duty enjoined on the Israelites (Deut. xxii. 1–4) in regard to a brother's ox or his sheep, going estray, and in regard to all lost things of their brethren, was held by the Jews, as we are informed by the learned Selden (De Jur. Nat. et Gent. juxta Discip. Ebr. lib. 6, c. 4) to be limited to their race, and they did not consider the direction obligatory on them, in relation to strangers. The rules of the common law and of natural law, as summarily expressed by Chancellor Kent, in his learned and valuable Commentaries on American Law, give nothing to the finder, in such cases, by way of reward; he can only demand of the owner an indemnity, a reimbursement of necessary expenses; but, if the articles found be not demanded in reasonable time and after due notice, they become the property of the finder, unless some other appropriation be directed by positive enactment. Such is the law of England, in regard to goods found on land, not coming under the denominations of "wreck," "estray," "waif," or "treasure-trove." In Massachusetts, and in other states, the disposal of lost goods, found on land, is regulated by statute, and there being no such statute provision respecting goods taken up at sea, as in this case, it is argued, that, no owner having appeared, after such great length of time, the residue belongs to the fortunate finder, or if it belong to the public, that the state of Massachusetts, and not the United States, should be considered as having the ultimate right to the property, in default of appearance of the original owner.

In regard to property shipwrecked, or goods thrown overboard in extremity, a very early and uniform solicitude appears to have been manifested. In this respect the character and expression of the civil law, are admirable, and highly honorable to the Roman jurists, who, generally, were imbued with the sentiment and spirit of a generous and elevated philosophy. A doubt may be reasonably entertained, whether the laws of Rhodes possessed the harsh and unsocial feature, in this respect, which some learned writers have asserted, or whether the commencement of just and humane dispositions in this particular, in the Roman law, is to be referred to so late a period as the reign of Constantine, or even to the earlier time of Antoninus. The goods saved by Captain Peabody and his crew, must be considered as either having been thrown overboard from some ship or vessel, in imminent peril, or swept from such vessel by force of the seas. Now, in regard to property found under such circumstances, humane, equitable, and suitable provision is found to have been made, in the civil law, and by the marine laws and usages of all commercial nations. The regulations and usages on this subject only differ as to the proportion that shall be given to the salvors, and as to the ultimate disposal of property, if no owner should appear; the nations, on the European continent, varying from a third to a half in the award of salvage. In England, there is no

fixed proportion; but a compensation is given, varying according to circumstances, always, however, with liberal reward to the encouragement of enterprise and exertion, in the exercise of which the whole commercial community have an obvious interest. Such also are the principles of allowance adopted in this country, in cases of salvage. The whole law on this branch of the subject is fully and ably stated by Mr. Justice Story, in the case of Rowe v. The Brig [supra].

In respect to the final disposal of the remaining proceeds of such derelict property, if no owner appear, it has been considered by approved writers and the current of foreign decisions, as accruing to the state; anciently it was devoted to some pious or charitable use. The Laws of Oleron (article 33), direct restitution of such property to the owner, or that it be given, devoutly, in alms, to the poor, "Jouxte le conseil de quelque sage homme discret selon la conscience." The Laws of the Hanse Towns, in the Revised Code of 1614, direct, that such goods be delivered to the principal magistrate of the city or to the oldest merchants, who are to award as salvage, from a twentieth to a quarter part of the property saved. Jus. Hans. tit. 10. No direction is given, as to the disposal of the residue, in case no owner should appear; but the article is considered as determining, definitely, the claim of the salvors. In Stypman's Jus Maritimum, and in Loccenius De Jure Maritimo, the ultimate right of the sovereign, in such cases, among the nations of Europe, is fully expressed.

The general maritime law, according to Loccenius, assigns the greater proportion of the property saved to the public treasury. "Derelicta tamen bona naufraga, quorum certo tempore non adparet dominus, pro majori parte fisco inferre, minorem partem inventori pro cura et custodia eorum adsignare, aequitati et juri gentium consentaneum videtur." Locc. De Jure Mar. c. 7. The French ordinance (of Louis XIV.) after determining the proportion to be awarded to the salvors, in such cases, assigns the remainder, if no owner appear within the time prescribed, one half to the admiral, the other half to the king, or his grantee. In England, the settled rule is, that such unclaimed residue is a droit of admiralty. It is sufficient to refer to the case of The Aquila, for the law, on this subject, in that country (1 C. Rob. Adm. 37): "The lord high admiral has the custody of derelicts found at sea, and if no owner appears, they become perquisites of admiralty; the finder can have no property in them, only a reward for his trouble, in preserving them; if no owner appears, or if the claimant cannot prove his property, the salvors have not acquired any right in the thing found, but they must be satisfied for their expense and trouble, from a sale of the ship and cargo." Such is the doctrine recognised in that case. "I consider it," says the learned judge (Sir W. Scott, now Lord Stowell) "to be the general rule of civilized countries, that what is found derelict on the sea is acquired beneficially for the sovereign, if no owner appear." There can be no doubt that such would have been the decision in courts of admiralty in the colonies, before the Revolution; the only question that can remain, therefore, would be as to the rule of law on the subject in our present national position. If we were to pay any regard to the maritime law, in this particular, as evidenced in the writings of learned jurists, and by the codes, usages, and customs of commercial nations, the whole property cannot be awarded to the salvor, unless it should be required for giving him an adequate compensation for his exertion, hazard, and expenses. My examination has not presented to me any instance, either in England or on the continent, where the whole property has, in any such case, been decreed to the finder, though such award, as has been intimated, might be allowable, where otherwise reasonable compensation would not be made. If the claim made by the libellants should be sustained, and become the rule of practice, in such instances, in our courts, we should form a singular exception, among commercial nations, on a subject upon which uniformity is obviously desirable. It is argued by the libellants' counsel that such must be the result, or that no other disposal can be made of such balances remaining in court until some positive legislative enactment shall have given express directions. But the rules and usages of nations, on this head, I consider to be a portion of our maritime law, giving authority to the national courts, by virtue of the constitution and the laws establishing and regulating those courts, to adjudge, award, and decree, respecting causes of admiralty and maritime jurisdiction, as such maritime laws and usages shall direct or authorize. In this conclusion, I am supported by Mr. Dane, who, in his very valuable work, A Digest of American Law, has, from just analogies, considered as accruing to the United States, what in cases of shipwreck and jettison would, in our colonial condition, in instances occurring in the colonies, have belonged to the crown. The views of the venerable author on this and the connected topics are referred to by Chancellor Kent, in his Commentaries on American Law, in a manner that would indicate that they were approved by that distinguished jurist. Lecture 36.

Such a disposal of property of this description appears to correspond with the reasonable and humane attention, which, with some exceptions, in barbarous times, has uniformly prevailed, respecting such instances of calamity. In the first place, a full and liberal reward is given to the salvors; the residue remains in court, for a time, for the benefit of the owner, and in case of his non-appear-

ance, is to be paid over to the state. The receipt of such property into the national treasury, we may presume, will be with views and dispositions suitable to the age and to our free institutions, rendering the whole law on this subject, in its administration by the United States, as the wise and benevolent would desire. Writers on the Law of Wreck occasionally quote Juvenal's sarcastic lines,

"Quicquid conspicuum, pulchrumque est æquore
　　　toto,
　Res fisci est, ubicumque natat."

Whatever of such grasping spirit may have predominated, in times long past, or may have appertained to the claims of prerogative, no selfish or ungracious views belong to what is, in this case, conferred on the sovereign authority. I do not adopt the language of the English authorities, in this particular, without a degree of reluctance, that property found derelict on the seas is acquired beneficially for the sovereign, if no owner appear, provided it is to be understood, that such property becomes absolutely and irreclaimably vested in the sovereign, should no owner appear, within a year and a day from the time of the decree of salvage. It is more satisfactory to consider the sovereign authority as holding such property in trust, to be surrendered to reasonable claims which may be presented. The learned Vinnius, in stating the claims of the sovereign in cases of this description, informs us of the liberal practice in his own country after the legal time prescribed for the appearance of the owner has elapsed, and the money accruing from goods thus saved, deducting the allowance for salvage, is paid into the public treasury. "Hoc tempore elapso publicantur, et fisco acquisitae esse intelliguntur, qui tamen facile patitur eas redimi." In. quat. Lib. Inst. lib. ii. tit. 1.

This supplemental libel will be dismissed, and the requisite orders will be entered to transfer these proceeds, and other money remaining in the registry under similar circumstances, to the proper department of the government, on the principles and in the manner that have been indicated.