## UNITED STATES v. TYNDALE et al.

### (Circuit Court of Appeals, First Circuit. June 18, 1902.)

### No. 417.

1. PUBLIC ADMINISTRATOR—UNKNOWN DEATH—UNCLAIMED ASSETS.

While congress might properly provide that money found on a dead body floating on the high seas, to which no claim is made by heirs or personal representatives, should be paid into the federal treasury, yet, in the absence of legislation, money so found and brought into the custody of a United States district court on the libel of salvors is properly ordered paid over, after allowance of salvage, to the state statutory public administrator, especially when with a reservation of any rights of the federal government therein.

2. SAME.

Unclaimed assets of a decedent, which are in the custody of a United States district court, are within the purview of Pub. St. Mass. c. 131, § 2, providing that the public administrator in .each county shall administer on the estates of persons who die leaving property to be administered, and not leaving a known husband, widow, or heir in the commonwealth.

3. SAME.

Unclaimed assets of a decedent, which are in the registry of a United States district court, though sitting customarily or always in a particular county, may be administered on, in the absence of special determining circumstances, such as residence, priority of proceedings, etc., in any county in the district, as the fund is ubiquitous in each county; and the fact that a dead body floating on the high seas is brought to shore in a certain county, the assets found thereon being libeled by the salvors in the United States district court, usually sitting in another county, does not make the first county the place of administration to the exclusion of the second. U. S. v. Borcherling, 22 Sup. Ct. 607, 185 U. S. 223, 46 L. Ed. ——, applied.

Appeal from the District Court of the United States for the District of Massachusetts.

Henry P. Moulton, U. S. Atty., and William H. Garland, Asst. U. S. Atty.

Theodore H. Tyndale, pro se.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. The essential facts relating to this appeal can be briefly stated. They concern a claim, on the one side, by the United States of America, and, on the other, by the public administrator appointed under the statutes of Massachusetts by the probate court for the county of Suffolk, to the undisposed of balance of certain personal property found on the body of a deceased person floating on the high seas, out of the territorial jurisdiction

of any particular state and of the United States. The only thing which might lead to identification was a scrap of paper on the body, bearing the name "H. Selrahc." The property was brought into Gloucester by the salvors, and libeled by them for salvage in the district court for the district of Massachusetts, and the amount now in dispute is the balance remaining in the registry of that court after the claim of the salvors was disposed of. The owner of the property is as yet unknown, and on this appeal the only claimants are the United States and the public administrator. Both intervened by leave of the district court, and on October 25, 1901, that court entered a final decree as follows:

"And now this cause having come on to be heard, and all the parties claimant having been fully heard therein, and after due consideration, it is ordered, adjudged, and decreed that the sum now remaining in the registry of this court, to wit, the sum of four hundred eleven and $31/100$ dollars (less five and $10/100$ dollars, the amount to be paid to the clerk for clerk's fees), be paid and delivered to Theodore H. Tyndale, public administrator, one of the claimants in said cause; all rights, if any, to make claim to said sum, or any part thereof, on the part of the United States and of the original petitioners, William H. Gardner and William Parsons, to be reserved while said sum is in the hands of the public administrator or in the treasury of the commonwealth of Massachusetts."

Thereupon, the United States appealed.

The only propositions before us are: First, that the United States have a superior right to the possession of the fund; and, second, that the statutes of Massachusetts do not justify administration in Suffolk county. As to the first, we are of the opinion that it would have been appropriate, and within its constitutional powers, for congress to have taken control of this fund; but it has not done so. There is neither any statute nor any settled practice which requires the treasurer of the United States to receive it, or authorizes us to direct that it shall be received by him. More especially there is no provision of law by which, if the fund be paid into the federal treasury, it can be recovered by whosoever may appear and prove title to it. On the other hand, if the fund goes into the hands of Mr. Tyndale as public administrator, it will be held for a series of years for the benefit of whomsoever it may concern. The statutes of Massachusetts controlling this matter direct that, when an estate has been fully administered by the public administrator, he shall deposit the balance of it with the treasurer of the state, "who shall receive and hold it for the benefit of those who may have legal claims thereon." They also provide that at any time within six years after the fund is so paid to the treasurer, any person, legally entitled, may obtain administration, and thereupon may receive the money thus deposited, "to be administered in like manner as the estates of other deceased persons." Rev. Laws, c. 138, §§ 12, 14, 15. Presumably, after the expiration of the six years named in the statute, the moneys could not be drawn from the treasury without legislative action; but, if the fund now in question should be paid into the treasury of the United States, there is nothing in the laws of congress to impress it with a trust in behalf of the owners for any period whatsoever, and it could not be withdrawn without congressional action, the dif-

ficulty of obtaining which is a notorious factor. Meanwhile the right of the United States to establish a claim to this and other like funds will not be in any way impaired, and it will be in season to consider such a claim when congress authorizes it to be made, whether by general or special legislation.

Like matters of pilotage (Cooley v. Board, 12 How. 299, 13 L. Ed. 996), and sea-coast fisheries (Manchester v. Com., 139 U. S. 240, 266, 11 Sup. Ct. 559, 35 L. Ed. 159), and the establishment of quarantine at sea ports, the jurisdiction with reference to properties of the char-acter here involved is of a mixed nature, as to which the state may act until and except so far as the United States intervene. Congress has intervened only to a very limited extent. Rev. St. §§ 4238, 4239, 5358. The resolution of June 21, 1870 (16 Stat. 380), now section 3755 of the Revised Statutes, relates, apparently, to property which ought equitably to go to the United States, and not to wreckage of any kind. While these provisions spring out of the constitutional powers of congress, which authorize it to legislate more broadly, yet the very fact that they are narrow is a special caution to the federal courts to withdraw their hand from any attempt to outline rules of their own making.

Of like limited effect are various provisions in treaties between the United States and foreign countries. Some of them, in the ab-sence of legislation by congress with reference thereto, seem to re-quire a disposition of this fund such as was made of it by the dis-trict court. Among others we may cite the treaty with Prussia of June 16, 1852 (Treaties and Conventions between the United States and Other Powers [Ed. 1889] p. 920), which, in article 14, after di-recting what substantial rights the representatives of deceased citi-zens or subjects of either country shall receive in the other, adds: "And in case of the absence of the representative, such care shall be taken of the said goods as would be taken of the goods of a native, in like case, until the lawful owner may take measures for receiving them." For aught that appears, the unfortunate man from whose person the property salved was taken may have been a subject of the emperor of Germany, who succeeded, so far as this treaty is con-cerned, the king of Prussia (Terlinden v. Ames, 184 U. S. 270, 22 Sup. Ct. 484, 46 L. Ed. 534), so that by express provision his estate is entitled to the benefit of the protection which the statutes of Mas-sachusetts referred to afford the estates of residents.

Notwithstanding these propositions, the United States rely on the very learned opinion of Judge Davis in Peabody v. Proceeds of 28 Bags of Cotton, 2 Am. Jur. 119, 19 Fed. Cas. 39 (No. 10,869). The difficulties which we meet were not considered by Judge Davis, the whole force of whose reasoning only leads up to the proposition, which we admit, that it is within the constitutional powers of con-gress to take control of this fund, and of others like it. The con-clusions which he draws from what was said by Mr. Dane and Chan-cellor Kent are hardly supported by the text of those learned writers. Chancellor Kent refers to Mr. Dane, and all that Mr. Dane says which is appropriate to this topic will be found in his Abridgment (volume 3, 133). Speaking generally about lost property, he says

that in England and in many countries the king is viewed as the new owner. He adds:

"But here the public, the state or nation, is solely and directly the new owner. The same principle which makes the king in England this new owner, as of jetsam, flotsam, treasure trove, etc., will make the public so here."

It is not necessary that we should go into any distinctions between things found on the sea and those found on the land, or undertake to investigate whether the property salved in this case could be properly classified as lost within the meaning of the common law, or as within any of the ancient law terms ordinarily used, because the disposition of these distinctions by the decree of the district court cannot be revised on this appeal. Therefore it is enough to say that, whatever was the title of the king at common law, it was based on royal prerogative, was appurtenant to the crown, and was, for the most part, classified among the royal revenues. This is fully explained at various points by Blackstone, and by Lord Chief Justice Hale in "De Jure Maris." It is clearly summed up by Hall on the Seashore (2d Ed.) 80, as follows:

"In like manner, wreck (when no owner can be found) is part of the king's ordinary revenue, in right of his royal prerogative, and is a flower of the crown. So, also, flotsam, jetsam, and ligan are perquisites of the crown."

All of these could be granted by the king without authority of parliament. A singular instance of this is given by Dane (volume 3, 137) in reference to the grant of the province of Maine from the king to Sir Ferdinando Gorges. While there can be no question that the sovereign peoples in Anglo-Saxon America, whether the various states or the United States, did, in some way, succeed to all the rights of the English king and of the English people, yet, until some recognized line of procedure or some action of congress intervenes, it is not within the province of the courts to determine that the treasury of the United States represents any particular royal prerogative.

It is worth while to notice that our colonial policy radically differed from the severe common-law rules as to wrecks and as to property floating on the high seas under such circumstances that it might well be regarded as an incident of some maritime misfortune, and that this difference is now accepted as a part of our common law, except so far as it has been enacted into the statutes. The Body of Liberties, enacted in 1641 by the Massachusetts Bay colony, and which must be accepted as a codification of the ordinances and usages in force at its date, provided:

"90. If any ships or other vessels, be it friend or enemy, shall suffer shipwreck upon our coast, there shall be no violence or wrong offered to their persons or goods. But their persons shall be harboured, and relieved, and their goods preserved in safety till authoritie may be certified thereof, and shall take further order therein."

Mr. Angell, in his Treatise on Tide Waters (1847), at pages 289–295, has sufficiently explained this divergence from the strict rules of the common law, and has made it clear that courts in the United States cannot, with safety, without the aid of legislation, always build up theories or construct policies based on English precedents.

Therefore, for these various reasons, we must hold that the conclusions of Judge Davis on which the United States rely overlooked the fundamental propositions to which we have called attention.

This leaves the second proposition made by the United States, the only effect of which, if sustained, would be to retain the fund in the registry, because what we have already said leaves the United States without any right to it which they have formally asserted, and in the position of merely a friend of the court. It seems to be the law of Massachusetts that under some circumstances the conditions under which administration has been granted by a probate court may be looked into collaterally by other courts for the purpose of determining whether the grant was valid or void. Crosby v. Leavitt, 4 Allen, 410. We need not examine the topic particularly, because this proposition does not seem to be contested. It is said that the deceased, whomsoever he might have been, left no property at the time of his death in Massachusetts; but, although such a case would seem not to be within the mere letter of the statute by virtue of which administration was granted (Pub. St. c. 131, § 2), yet the construction given thereto by the local tribunals broadens it out so that it may reach property brought into the state after death. This is not an unreasonable construction of the statute, is necessary to accomplish its purposes, and does not seem to be contested by the United States, who apparently rest their claim on the proposition that money in the registry of the district court is not within the legislative purpose. They especially maintain that this fund was not property within the county of Suffolk, where the administration was granted, because it was brought by the salvors into Gloucester, in the county of Essex, and came into the registry of the court, which ordinarily sits at Boston, in the county of Suffolk, by virtue of its process bringing it there. The first proposition is clearly so unsustainable in law that it needs no discussion. This is palpably so, because, if otherwise, it would bring us face to face with a like proposition that the existence of a fund in the registry of a federal court in the district and state of Massachusetts could, under no circumstances, give jurisdiction for administration, whether to a resident of the state or to a foreigner.

So far as the other proposition is concerned, we think it is fully met by the broad rule that a fund which is in the registry of a federal court sitting ordinarily or always in any particular county in the district and state of Massachusetts is a fund in each and every county, and may properly be administered on in any county, unless there is some restriction in a particular case growing out of some special matter; as, for instance, the residence of the deceased, or the priority of application to some particular probate court. Certainly, the fact that the salved goods were first brought into the port of Gloucester cannot be regarded as material, because they were not retained there, and never were there under such circumstances as to give any local tribunal any fixed jurisdiction with reference to them. It is also a peculiar fact, illustrating our main proposition as to the habitat of this fund, that the district court may, at its option, hold its sessions in any part of the state.

Our position in this particular is within the broad principle of the rule laid down by the supreme court, which has said that debts due from the United States have no locality at the seat of government,. and that "the United States, in their sovereign capacity, have no particular place of domicile, but possess, in contemplation of law, an· ubiquity throughout the Union." Wyman v. Halstead, 109 U. S. 654, 657, 3 Sup. Ct. 417, 27 L. Ed. 1068. This has lately been reaffirmed in U. S. v Borcherling, 185 U. S. 223, 22 Sup. Ct. 607,. 46 L. Ed. ——, where the language cited, which first appeared in Vaughan v. Northup, 15 Pet. 1, 6, 10 L. Ed. 639, was repeated, and was applied to the extent of holding that, in consequence of this rule,. one who had been appointed a receiver by a· state tribunal in New Jersey was entitled to proceed against the secretary of the treasury within the district of Columbia, and also in the court of claims.

Some particular phases of the last topic have been very fully and satisfactorily discussed in the opinion of the learned judge· of the district court, but they do not require any special notice from us, because what we have said we think necessarily disposes of the whole matter.

The decree of the district court is affirmed, without interest or costs.