## THE FAIRISLE.

### No. 2874.

District Court, D. Maryland.

Nov. 17, 1947.

I. Duke Avnet, of Baltimore, Md., and John P. McKinley, of Savanah, Ga., for libellants.

Southgate L. Morison, of Baltimore, Md., and Eugene F. Gilligan, of New York City, for respondents.

COLEMAN, District Judge.

This is a salvage suit, involving the refloating of the Steamship Fairisle on September 5, 1946, after she had stranded in the Bay of Bengal, off the east coast of India, near the town of Bavanapadu. The libellants consist of four officers and twenty-seven men of a total complement of thirty-seven officers and crew of the Government-owned Liberty Ship, Furnifold M. Simmons. The master of the vessel is not a party libellant, nor has any suit for salvage been brought by the owners of the vessel.

The Fairisle is a single screw cargo steamer, modified C–2 type, equipped with steam turbines, and was built in 1942. She is of 7373 gross and 4816 net tons register, with a length of 449 feet, beam 63 feet, approximately. At the time of her stranding in the early morning of August 27, 1946,

she was proceeding in ballast from Calcutta to Vizagapatam, India, with draft forward of about 6 feet, and aft, 17½ feet. The weather was warm and clear with a light southwest breeze and calm sea, except for a long southeasterly swell. The vessel went aground due to faulty navigation, not induced by any untoward conditions of weather or sea, and became fast in the sand, head-on to the beach, about 150 yards away, and within about a mile of a rocky reef. Thereafter, and until she was refloated on the early morning of September 5th, the weather and sea conditions continued favorable. While stranded, her engines and equipment remained in good operating condition, and she did not make any water, although it was testified that ultimately some $114,000 were expended on repairs to her hull, all claimed to have been the result of this stranding.

The Fairisle radioed for assistance in her plight. None of the usual salvage service was available except from a distance of several hundred miles, at least. On August 29th three small craft of the Indian Navy arrived and endeavored to help, but they were rather light craft, not equipped with adequate cables, and their efforts were not successful. However, the Furnifold M. Simmons, hereinafter called the Simmons, a Liberty ship of dimensions comparable to that of the Fairisle, and which had been lying, light, in the harbor of Calcutta, got under way on August 28th and proceeded to the aid of the Fairisle, by direction of the War Shipping Administration representative in that place. On the night of August 29th she anchored some 600 yards off the Fairisle. Naturally, the Simmons was fearful of getting too far in shore, and being stranded herself. The Simmons drew approximately 18 feet aft, although there is some discrepancy in the testimony as to what was her exact draft aft. During the refloating operations she was anchored so that she lay with her stern to the Fairisle.

From August 31st to the early morning of September 5th, about five days, both the Simmons and the Fairisle were engaged in efforts to make secure adequate wire cables from one vessel to the other for the purpose of refloating the Fairisle. During this period, because of the heavy swell, the shallow water, the breaking of the sea against the sides of the Fairisle, and the difficulty in using, as was found necessary, small boats from both vessels, including a motor boat from the Simmons (the Fairisle having no small power boat), often in close proximity to the beach and to the Fairisle, there was unquestionably considerable hazard. In one phase of the operations one of the small boats from the Simmons was almost swamped by the surf, and her crew had to beach the boat and subsequently lost her. As a result of the difficulties encountered, certain of the officers and crew of the Simmons spent two days and two nights on the beach, being unexpectedly required to do so. While there, they were subjected to some discomfort, but no peril.

The difficulty in securing the proper wire cables between the two vessels was due, as disclosed by the evidence, to a large extent to the precaution taken by the Simmons in lying well off shore, lest she also might be stranded. In other words, the main difficulty lay in handling long and very weighty cables over such an expanse of shoal but turbulent water between and near the two vessels. However, in the early morning of September 5th, the Simmons having moved closer to the Fairisle which had shifted water and fuel forward and had jettisoned seventy tons of fresh water and seventeen hundred tons of fuel oil, with the Fairisle's engines working astern and the Simmons towing lines having been secured, the Fairisle was floated. She then remained at anchor at a safe distance off shore until the morning of September 6th, when she proceeded under her own power to Vizagapatam, where she loaded cargo, and thence proceeded to her ultimate destination, Baltimore, arriving there in October.

As already stated, the work performed from the time of the Simmons' arrival on August 29th until the Fairisle was refloated on September 5th was mainly directed to securing the towing cables between the two vessels. This was undoubtedly a difficult and at times hazardous operation, for the reasons already explained. However, neither the Simmons, nor those who remained aboard her were in any real danger, al-

though, as already explained, quite a hazard faced those working in the small boats, trying to secure the lines to and from the Fairisle. Neither the Fairisle, nor those aboard her, were in any real immediate danger. Her officers and crew could all have been gotten off in small boats to the Simmons, or been put ashore, but the latter probably would have been a hazardous undertaking. However, the Bay of Bengal is within the tropical cyclone belt or area, which represented a very great potential hazard. From the United States pilot charts of the Indian Ocean which were introduced in evidence, it appears to be an established fact, by reason of the data accumulated over many years, that in the month of August few tropical cyclones, that is, the really dangerous tropical storms, occur in this area, and that the few that do occur in that month are never as severe as during the spring and autumn months. However, it is also disclosed by these charts that in September tropical cyclones are confined principally to the Bay of Bengal, and that here occur during that month the undeveloped cyclones peculiar to August, and, in addition, the more dangerous whirls of autumn. The earlier the northeasterly winds set in, that much earlier is there a predisposition to storms of a severe type. With respect to October, it is disclosed that, in this general locality, this month is considered the most treacherous of the entire year. The value of the Fairisle is given as $950,000 in her damaged condition; and the value of the Simmons at the time she succeeded in floating the Fairisle as approximately $544,000. There is no evidence in the present case that any storm did in fact occur in the locality of the stranding, any time thereafter.

On behalf of the owners of the Fairisle, the work of refloating her by the officers and crew of the Simmons is treated as a simple matter, in view of the favorable weather conditions, the fact that the Fairisle was not crippled, and that as soon as the lines were secured, towing her off the sandbar was easy. Also, it is asserted on behalf of the Fairisle that the work could have been accomplished very much more quickly had the Simmons moved in shore, nearer to the Fairisle, at the start of the operations, which, it is claimed, she could have done with safety.

On the other hand, on behalf of the officers and crew of the Simmons it is asserted that they not only worked long and hard under unusual conditions, but that often, as far as those of them who were in the small boats were concerned, their lives were in danger. Also, it is claimed that it was largely due to the perspicacity of one of the Simmons' crew while forced to spend a night or two on the beach that the floating of the Fairisle was ultimately accomplished, namely, to his discovery that whereas for the purpose of better visibility, the salvage work had theretofore been conducted in daylight, it should have been conducted at night, since he discovered, as a result of being on the beach, that the tides at night were somewhat higher than in the day. The Fairisle was in fact ultimately floated while following this proposal.

In the absence of contradictory testimony, full credit should be given to this alleged discovery, and, also, to the very efficient, skilful and apparently untiring efforts of the officers and crew of the Simmons. Indeed, it is in evidence that the master of the Fairisle thought at one time during the operations that it was a hopeless situation —that the Simmons could not release the Fairisle—but the master of the Simmons disagreed, and, due to his energy, persistence and foresight, success crowned his efforts and those of his men.

We come, then, to the sole question in the case: What is the fair value of the salvage? It is conceded that the libellants are clearly entitled to some reward for what they did. What should that reward be? In this Circuit, in The Kia Ora, 4 Cir., 252 F. 507, a decision of the Circuit Court of Appeals in 1918, during the first World War, that court gave a very clear statement of what should be the approach in a case of this kind to a determination of the proper salvage award. The court said 252 F. at page 508: "The elements which enter in the estimate of salvage are: (1) The value of the property in peril and the proportion of the value lost and saved; (2) the degree of peril from which lives and

property are rescued; (3) the value of the property employed by the salvor, and the risk of life and property incurred; (4) the skill and dispatch shown in rendering the service together with the foresight and skill exercised in the preparation to render it; (5) the time consumed and the labor performed by the salvor. * * * The consideration of all these elements should result in an award which will express reasonable actual compensation for the labor, risk, and skill of the salvor and the use of his vessel and appliances, and an added amount based on the degree of peril of property and life and the value of the property saved and lost sufficient to promote the highest degree of readiness and efficiency for the relief of vessels in distress."

Continuing, the court said, 252 F. at page 509: "Examination of the many cases with their varying facts gives a general sense of the proportion which the award ought to bear to the risk and expense incurred, the skill employed, the value of the property saved and the property lost, the peril of the vessel and cargo, the investment and enterprise of the salvor, the liberality of the allowance for profit in order to encourage enterprise in assisting in saving vessels in peril. *But no formula can be derived which will meet the justice of every case. The per cent. basis is no longer followed, because its application to the large values of modern times would lead to obvious injustice.*" (Emphasis supplied.)

In that case, the appellate court increased the award made by the lower court to the Merritt and Chapman Derrick and Wrecking Company, the sole libellant, from $100,000 to $150,000. Summarized briefly, the facts in that case were that a steamer which, with her cargo, was valued at nearly four million dollars, was released from a coral reef in the Bahama Islands, under circumstances somewhat akin to those in the present case. The court found that the vessel's situation was perilous because she was stranded, as was true of the Fairisle, at a time and in a region of frequent storms. It appears that the salvor vessel in that case started for the stranded ship on the evening of February 26th, 1917, reached her, 360 miles distant, a day or two later,

and immediately began the work of releasing her. The appellate court stated in its opinion, 252 F. at page 508: "Continuous and skillful work resulted in releasing the Kia Ora at 3:45 p. m. Saturday, March 3, in such condition that, although somewhat injured, she was able to proceed without assistance to Newport News." It appears that the value of the salvor ship was $450,000.

In the present case there is a tremendous gap between the respective amounts which the opposing parties claim would be a proper allowance. Counsel for libellants claim that the sum of $300,000 would be an appropriate allowance to them. Counsel for the owners of the Fairisle, however, urge upon the Court that to give anything in excess of approximately $10,000 would be contrary to the weight of authority, and unreasonable under the circumstances.

We believe that the amount asked by libellants' counsel is absurdly excessive. The facts in no two cases are alike, and especially in cases of this kind there are usually found one or two major factors that differentiate a particular case from all others. The case of the Kia Ora did not involve, as does the present suit, claims by officers and crew of the salvage ship. Whether this was because there was some arrangement to compensate them out of the award made to the owner of that ship, namely, the wrecking company, does not appear. Nevertheless, there is a broad, general similarity between the situation here and that disclosed in the case of the Kia Ora, supra, although it by no means affords a fixed rule. Counsel for libellants would have us adhere to a rule which, as stated in the opinion in the Kia Ora case, has been repudiated. We are asked on behalf of libellants to make an award, were the Simmons here also appearing as a libellant along with the present libellants, of approximately $450,000, one-third to be considered as her owner's share, the other two-thirds, or $300,000, to be apportioned among the present libellants, officers and crew. It is claimed that the officers should be awarded a double share, and that unlicensed crew members who underwent special risk in the small boats and on the beach should be

awarded a double share out of this total of $300,000, with the result, as claimed, that an award should go to each unlicensed crew member, who were subjected to no special risk, of approximately $4,800, and to each officer and each crew member who were subjected to special risk, approximately $9600.

We turn now to the great contrast between this and what counsel for the respondents urge upon us. We are asked by them to adopt a different yardstick, namely, one of wages, on the ground that there was no real hazard; no grave danger to life or limb, or to either vessel; no cargo involved, and, that, therefore, all allowances should be small. The basis proposed is as follows, a total of $10,900, broken down in this fashion: To each of the ten members of the crew who took part in the salvage operations on the Simmons only, that is, who did not take to the small boats and thereby run greater risk, an award of a month's extra wages, or 10 times $200, their then monthly wage, a total sum of $2,000; to each of the two officers who were in a like situation during the salvage operations, a month's extra wages, or twice $300, a total of $600; and to those officers and members of the crew who performed salvage services in the small boats or on the beach, double monthly wages. That would mean for seventeen members of the crew, $6,800; for the two officers, $600 apiece, or $1,200; and then, because of being stranded on the beach overnight, to each of six of the ship's complement, two officers and four members of the crew, there is proposed an additional award of $50, or a total of $300. So, on this basis a total award of $10,900 is proposed.

We do not believe that an award such as proposed by respondents sufficiently meets the requirements of the law. While, as just stated—and we state it very emphatically—we believe that the claim made on behalf of libellants is most exorbitant and without support of precedent, nevertheless, we also believe that, under all the circumstances of this case, when carefully reviewed in the light of the various factors which must be considered in fixing a salvage award, libellants are entitled to con-

siderably more than $10,900. We have concluded that they should be awarded the total sum of $45,100. In reaching this conclusion and apportioning this sum among the various parties, we are influenced to a considerable extent by the present depreciated value of the dollar, and by the fact that in considering and applying, as precedent, the early decisions it would be appropriate, if given precisely the same circumstances today as are disclosed in those cases, to make a considerable increase in the awards there made.

We believe that this total sum of $45,100 should be distributed as follows: as a flat sum to each of the 27 members of the crew, libellants here, the sum of $1,000, or a total of $27,000; to 17 of these 27 crew members an additional sum of $500 each for the more hazardous service which they performed off the salvor vessel, the Simmons; to four of them, a further sum of $200 each, because of the additional hardships which they underwent on the beach and under the other more adverse conditions to which those who did no salvage work except aboard the Simmons, were not subjected. This gives a total sum with respect to the crew of $36,300. Then, with respect to the four officers involved in the present case, we feel that each should have an award of $1,500, or $6,000; for two of them who engaged in the more hazardous small boat service there should be an additional award of $1,000, or $2,000; and, finally, to the two officers who were stranded on the beach, $400 each, or a total of $800; making a total allowance to the officers of $8,800, which, added to the total award to the members of the crew, as just explained, i.e., $36,300, makes a grand total of $45,100.

This proceeding is one in rem only. Following the filing of the libel, attorneys for both the libellants and the claimant, the Waterman Steamship Corporation, appeared before this Court for the purpose of having it determine the amount of the bond or stipulation to be filed in order to release The Fairisle from arrest.

The attorneys for libellants urged that the amount of the bond be not less than $1,000,000, stating that they expected to be

able to prove that the total amount of the awards allowable to the various libellants would be as much as that amount. On the other hand, counsel for the vessel argued that a bond for any such amount was totally unnecessary and excessive. On behalf of the vessel it was claimed that any reasonable allowance to all of the libellants combined could not exceed $10,900.

After hearing the contentions made on behalf of the respective parties, the Court concluded that libellants' figures were absurdly excessive, and ruled that a bond or stipulation in the amount of $25,000 was adequate under the circumstances as they appeared to the Court, in advance of a trial on the merits.

Accordingly, a bond was given for the release of The Fairisle in the sum of $25,-000. This bond contains a provision that the court has "fixed the amount of said bond or stipulation at $25,000 without prejudice, however, to the claims and rights of either of the parties as to the merits of the case and as to the value, if any, of the claims and suit of the libellants." However, counsel for claimant have objected to the entry by this Court of any decree in excess of the amount of the bond given, namely, $25,000. That is to say, counsel for claimant contend that even though this Court has found a greater sum to be due libellants, its decree, nevertheless, cannot exceed the amount of the bond originally given.

In support of this contention it is asserted on behalf of the claimant that (1) where a libel in rem only, as in the present case, is filed and the vessel owner answers and defends, this does not give the Court ground for rendering a personal judgment against the owner and he, therefore, is not liable for damages in excess of the amount of the bond; and (2) a vessel, once seized and released under a stipulation, cannot again be seized by the same libellant, for the same cause of action, in an action in rem. In support of these propositions counsel for the claimant cite The Virgin, 8 Pet. 538, 33 U.S. 538, 8 L.Ed. 1036; The Susanna, 4 Cir., 2 F.2d 410; J. K. Welding Co. v. Gotham Marine Corp., D.C., 47 F.2d 332; Moore v. Kimball, 5 Cir., 66 F. 340.

■ It is elementary, and long established by the weight of authority in this country, that a bail bond, given to secure the release of a vessel in an in rem proceeding, stands in place of the vessel. Thus, the liens asserted against the vessel are discharged and cannot be revived in such proceeding, and there can be no re-arrest for the same claim, unless the release of the vessel on bond has been secured by misrepresentation or fraud. However, we find nothing in the decisions which prohibits this Court, under the particular facts of the present case, from giving full force and effect against the claimant to the total award it has made. In none of the cases relied on was the situation parallel with that in the present suit.

In the first place, the decisions relied on involve situations where the parties had *agreed* upon the amount of the bond or stipulation; whereas in the present case the parties were totally unable to agree and invoked the aid of the Court in fixing the amount of the bond or stipulation. Second, the bond or stipulation in those cases represented the *agreed estimated value of the vessel;* whereas in the present case, the amount of the bond was fixed without relation to the value of the salved vessel which, obviously, was very much more than the amount of the bond which the Court directed be given. The latter relates solely to the *Court's estimated value of the salvage services* rendered by libellants for which they might be entitled to an award in admiralty.

■ With these substantial distinctions between the facts in the case before us and those involved in the cases relied upon by claimant's counsel, we are satisfied that there is no principle of admiralty law which prohibits this Court from rendering a decree against claimant for the total amount of the award, and which shall permit libellants to have execution against *any* property of claimant, including claimant's interest in The Fairisle herself, in the event the decree is not paid in full. Of course, the amount which the surety on the bond can be required to pay cannot exceed the amount of the bond.

The precise point which counsel for claimant has raised appears, strangely enough, to have been the subject of decision on a similar state of facts in only one reported admiralty case in this country. That decision is in The Minnetonka, 146 F. 509, rendered in 1906 by the Circuit Court of Appeals, Second Circuit.

In that case a ship's passenger had libelled the ship to recover the value of jewelry stolen by an employee of the ship during the voyage. The value of the jewelry was stipulated by the parties at $5,000 and the ship was accordingly bonded for that amount, it being based on the cost of the jewelry several years earlier. Upon a reference to a commissioner, the value of the jewelry was more fully considered and the commissioner found, upon the undisputed testimony of an expert, that the jewelry's present value was in excess of $7,000.

With respect to one of the contentions made on behalf of the ship that the District Court had improperly allowed recovery for the value of the lost property over and above the $5,000 for which the vessel was bonded, the appellate court said, in deciding that it was proper for the District Court to have allowed recovery for such excess, which was more than $2,000 in excess of the amount of the bond (146 F. at page 515): "The question, then is, shall the libellant be precluded from recovering the full amount of her damages because, through inadvertence, she stated them in her pleading at $2,000 less than they actually are? Were this an ordinary action at common law or in equity, to state the question would be to answer it. Amendments conforming the pleadings to the proof are constantly being permitted under similar conditions. No case has been cited and we have been unable to find one preventing the court, sitting in admiralty, from exercising a sound discretion in allowing amendments where the object is merely to correct an estimate as to value, involving the introduction of no new facts or change in the cause of action. The Atlantic Transport Company appeared in the action as claimant, and it was within the power of the court to direct a decree against it for the balance of the libelant's loss. A court of admiralty has powers akin to those of a court of equity, and should not be hampered in its efforts to reach a substantial justice by the inexorable rules invoked by the claimant. As it was said by the Supreme Court:

" 'It is objected that the libel does not specifically charge this antecedent negligence as a fault. This is true, and the libel is defective on that account, but in admiralty an omission to state some facts which prove to be material, but which cannot have occasioned any surprise to the opposite party, will not be allowed to work any injury to the libellant if the court can see there was no design on his part in omitting to state them. There is no doctrine of mere technical variance in the admiralty, and, subject to the rule above stated, it is the duty of the court to extract the real case from the whole record and decide accordingly.' The Syracuse [12 Wall. 167], 79 U.S. 167, 20 L.Ed. 382."

While The Minnetonka is not a salvage case, we see no reason for refusing to apply in salvage or other admiralty cases, the same principle that was applied in The Minnetonka, where the circumstances with respect to the fixing of the amount of the bond or stipulation are similar to those in The Minnetonka, as they unquestionably are in the present case. Indeed, here an even stronger case is made for adoption of the rule laid down in The Minnetonka because the amount of the bond was fixed by this Court, not by the parties, and was, in the Court's opinion and impliedly by the very language of the bond itself, only an estimate of what the libellants might ultimately be found to be entitled to, by way of an award for their salvage work.

The conclusion here reached is consonant with the English authorities. They hold that if the vessel owner has made an appearance in an in rem action, damages or costs in excess of the stipulated value of the vessel may be assessed against him. See The Dictator (1892) L.R. Probate Division 304; The Gemma (1899) L.R. Probate Division 285; The Freedom (1871) L.R. 3 A & E 495.

The Dictator involved an action in rem only, for salvage services claimed to be

worth 5000 pounds, and a bond was given for this amount for the release of the vessel, whose value was very much greater than 5000 pounds. The Court made an award of 7500 pounds. The vessel owners denied liability for the excess of the award over the bond. The Court of Appeal affirmed the Admiralty Court in its holding that libellants' remedy was not limited by the amount of the bail, and that they were entitled to writs of fieri facias in order to enforce payment, by the shipowners personally, of the full amount of the salvage decree. The Court, in the course of its opinion, explained (pp. 312-321) that "under the earlier practice, the distinction between actions in personam and actions in rem depended on whether the person or property of defendant was arrested in the first instance, and, if the defendant appeared, the procedure and effect of the action in rem became those of an action in personam. But several changes in law or practice took place. Actions beginning with arrest of the person became obsolete in practice, * *. On the other hand, arrest of property over which the lien could be enforced became more common. * * * The result was that arrest became the distinctive feature of the action in rem, such arrest having primarily for its object the satisfaction of the creditor out of the property seized. But there seems no reason to suppose that the action beginning by arrest of the res altered the course or character it had hitherto assumed as to the appearance of the debtor in it; and, if that be so, it would seem clear that the full amount of a judgment, if a defendant, who might himself have been arrested, appeared, could be enforced by the means available in the Admiralty Court, monition and attachment, whatever the value of the property arrested was.

      \*    \*    \*    \*    \*    \*

"It appears to me consonant with common sense that if the owners have had no personal notice, and are not, * * * before the court, the effect of its judgment should be limited to the res in its hand, but that, if the owners appear to contest or reduce their liability, they should be placed in the same position as if they had been brought before the court by a personal notice."

While Judge Coxe, in rendering the decision of the Circuit Court of Appeals for the Second Circuit in The Minnetonka, supra, did not cite any decision precisely on this point, presumably he had in mind the English admiralty rule just explained, or at least was proceeding upon the same equitable doctrine when he stated, in that part of the opinion above quoted, that "A court of admiralty has powers akin to those of a court of equity, and should not be hampered in its efforts to reach a substantial justice by the inexorable rules invoked by the claimant."

 The result of such holding is not actually to engraft upon a suit in rem a personal liability by admiralty process, although no personal action has been brought as it might have been, but rather, as was explained in The Dictator, supra, if the owners appear to contest their liability, they may equitably be treated as if they had been brought into court by personal process.

For these reasons, we find no merit in claimant's contention that it is not liable for the full amount of the award which we have made in the present case. Accordingly, a decree will be signed consonant with this holding.