TREASURE SALVORS, INC., a corporation and Armada Research Corp., a corporation, Plaintiffs-Appellees,

v.

The UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, her tackle, armament, apparel and cargo located within 2500 yards of a point at coordinates 24.31.5′ north latitude and 82.50 west longitude, said sailing vessel is believed to be the NUESTRA SENORA de ATOCHA, Defendant,

United States of America, Intervenor-Appellant.

No. 76–2151.

United States Court of Appeals, Fifth Circuit.

March 13, 1978.

Michael W. Reed, U. S. Dept. of Justice, Washington, D. C., Marine Resources Section, Peter R. Taft, Asst. Atty. Gen., Land & Natural Res. Section, Bruce C. Rashkow, Atty., Dept. of Justice, Washington, D. C., for intervenor-appellant.

David Paul Horan and Joshua M. Morse, III, Key West, Fla., for plaintiffs-appellees.

Before BROWN, Chief Judge, GEWIN and TJOFLAT, Circuit Judges.

GEWIN, Circuit Judge:

Treasure Salvors, Inc., and Armada Research Corp., Florida corporations, sued for possession of and confirmation of title to an unidentified wrecked and abandoned vessel thought to be the *Nuestra Senora de Atocha*. The *Atocha* sank in the sea off the Marquesas Keys in 1622 while en route to Spain. The United States intervened, answered, and counterclaimed, asserting title to the vessel. Summary judgment was entered for the plaintiffs, 408 F.Supp. 907 (S.D.Fla.1976), and the government appealed. We modify the district court's judgment, and affirm.

This action evokes all the romance and danger of the buccaneering days in the West Indies. It is rooted in an ancient tragedy of imperial Spain, and embraces a modern tragedy as well. The case also presents the story of a triumph, a story in which the daring and determination of the colonial settlers are mirrored by contemporary treasure seekers.

In late summer of 1622 a fleet of Spanish galleons, heavily laden with bullion exploited from the mines of the New World, set sail for Spain. Spain, at this period in her history, was embroiled in the vicious religious conflicts of the Thirty Years' War and desperately needed American bullion to finance her costly military adventures. As the fleet entered the Straits of Florida, seeking the strongest current of the Gulf Stream, it was met by a hurricane which drove it into the reef-laced waters off the Florida Keys. A number of vessels went down, including the richest galleon in the fleet, *Nuestra Senora de Atocha*. Five hundred fifty persons perished, and cargo with a contemporary value of perhaps $250 million was lost. A later hurricane shattered the *Atocha* and buried her beneath the sands.

For well over three centuries the wreck of the *Atocha* lay undisturbed beneath the wide shoal west of the Marquesas Keys, islets named after the reef where the Marquis of Cadereita camped while supervising unsuccessful salvage operations. Then, in 1971, after an arduous search aided by survivors' accounts of the 1622 wrecks, and an expenditure of more than $2 million, plaintiffs located the *Atocha*.[1] Plaintiffs have retrieved gold, silver, artifacts, and armament valued at $6 million. Their costs have included four lives, among them the son and daughter-in-law of Melvin Fisher, plaintiffs' president and leader of the expedition.[2]

### Jurisdiction

The district court did not specify its basis of jurisdiction. With respect to the controversy presented by the parties, it was clearly within the court's power to declare title to those objects within its territorial jurisdiction. The government, however, contends that the court lacked *in rem* jurisdiction to determine the rights of the parties to that portion of the *res* situated beyond the territorial jurisdiction of the court.

*In rem* actions in admiralty generally require, as a prerequisite to a court's jurisdiction, the presence of the vessel or other *res* within the territorial confines of the court. *American Bank of Wage Claims v. Registry of District Court of Guam*, 431 F.2d 1215, 1218 (9th Cir. 1970); 7A Moore's Federal Practice ¶ E.05, at E–202 (1977). This rule is predicated upon admiralty's fic-

---

**1.** Plaintiffs began their salvage operation pursuant to a contract with the state of Florida. Under the contract, the state was entitled to 25% of the finds. The decision in *United States v. Florida*, 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975), refuted Florida's claim to the wreck site, and the contract was cancelled. *See also United States v. Florida*, 425 U.S. 791, 96 S.Ct. 1840, 48 L.Ed.2d 388 (1976). It is undisputed that the wreck lies on the continental shelf, outside the territorial waters of the United States. (A. 68).

**2.** Our brief historical summary is based in part on Lyon, *The Trouble with Treasure*, 149 National Geographic 787 (June 1976).

tion of convenience that a ship is a person against whom suits can be filed and judgments entered. *Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 22–23, 80 S.Ct. 1470, 1472–1473, 4 L.Ed.2d 1540, 1543 (1960). Personification of the ship allows actions to be brought against the vessel when her owner can not be reached. *Id.* In these circumstances the fiction may perform a useful and salutary function. But when a legal fiction which exists solely to effectuate the adjudication of disputes is invoked for the opposite purpose, we have no hesitation in declining to employ it.[3]

Other courts faced with similar challenges to their jurisdiction have refused to myopically apply this fiction where its application was inappropriate to the situation before them. In *Booth Steamship Co. v. Tug Dalzell No. 2*, 1966 A.M.C. 2615 (S.D.N.Y.1966), the claimant to the *res* contested the court's *in rem* jurisdiction on the grounds that the *res* was not within the territorial jurisdiction of the court. In its pleadings the plaintiff had alleged, as in the case before us, that the *res* was within or during the pendency of the proceedings would be within the court's jurisdiction. The claimant's answer admitted this allegation. After reviewing the decisions on this question the court held:

> [T]he mandate of Admiralty Rule 22 requiring that in an *in rem* action, the libel allege the presence of the *res* in the district, does not relate to subject matter jurisdiction, and therefore actual local seizure or a tangible substitute thereof, such as the posting of a bond, is not a prerequisite to the maintenance of an *in rem* action. The claimants-petitioners, by admitting the presence of the *res* within the district, by filing a claim to the tug *Dalzell # 2* and by filing and serving a general appearance, have submitted that vessel to the jurisdiction of this court.

*Id.* at 2618.

The Third Circuit reached a similar conclusion in *Reed v. Steamship Yaka*, 307 F.2d 203 (3d Cir. 1962), *rev'd on other gds.*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). There, the *res* was also outside the court's territorial jurisdiction, but the claimant voluntarily appeared and answered the complaint "to avoid attachment and delay of the vessel if it should subsequently be present" within the court's jurisdiction. The court held that by this act the claimant had waived the requirement that the *res* be arrested by the court and had consented to the court's jurisdiction over its interest in the vessel. *Id.* at 204–05.

Finally, the Supreme Court, in *Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960), *aff'g*, 268 F.2d 240 (5th Cir. 1959), permitted the transfer under 28 U.S.C. § 1404(a), with the claimant's consent, of an *in rem* action in admiralty to a district in which the *res* was not present. The Court based its decision upon the fact that this transfer would prevent "unnecessary inconvenience and expense to parties, witnesses, and the public." *Id.* at 21, 80 S.Ct. at 1472, 4 L.Ed.2d at 1542. It is true, as Justice Whittaker stated in his dissent in *Continental Grain,* that the Court did not decide the question of whether the owner's consent can confer *in rem* jurisdiction in an action where the *res* is not within the territorial jurisdiction of the court. However, as commentators have noted, the Supreme Court appears to favor the position that the presence of the *res* within the district is not an absolute prerequisite to the court's jurisdiction.[4]

These decisions evidence the common concern of the courts with finding the most practical and efficacious means of resolving the disputes before them. An interest in rendering justice rather than an automatistic reliance upon rigid legalisms characterizes each of them. It is with these examples before us that we turn to an examination of the merits of the government's jurisdictional challenge.

---

**3.** The fiction of a ship's personality is criticized in G. Gilmore & C. Black, The Law of Admiralty, 615–22 (2d ed. 1975).

**4.** *See* 7A Moore's Federal Practice ¶ E.05 at E203–E206 (1977); The Law of Admiralty, *supra* n.3, at 616 n. 75a. *See also* 2 E. Benedict, The Law of American Admiralty § 242 (1940).

Initially we note that for all practical purposes it was impossible to bring the entire remains of the vessel and her cargo within the territorial jurisdiction of the court. Thousands of items retrieved from the wreck site were brought into the district, but the bulk of the wreck lies buried under tons of sand in international waters. The district court did everything within its power to have the marshal arrest the vessel and bring it within the custody of the court.[5] Thus, there is little danger that the *res,* against which any claims might be satisfied, will escape an *in rem* decree against it.

In this case, as in the three cases we have discussed, the court had *in personam* jurisdiction over the claimants,[6] thus rendering the vessel's arrest nonessential to the resolution of the action. The United States intervened in plaintiffs' *in rem* action as a party defendant and filed a counterclaim asserting a property right in the *res.* The government, by intervening in this action and by stipulating to the court's admiralty jurisdiction (A. 67), waived the usual requirement that the *res* be present within the territorial jurisdiction of the court and consented to the court's jurisdiction to determine its interest in the extraterritorial portion of the vessel.

Alternatively, we note that assuming a lack of *in rem* jurisdiction of that part of the wreck lying outside the territorial waters of the United States, the district court is not deprived of jurisdiction over the government's counterclaim if that claim rests upon an independent basis of jurisdiction. *Sachs v. Sachs,* 265 F.2d 31 (3d Cir. 1959); *Haberman v. Equitable Life Assurance Soc'y of United States,* 224 F.2d 401, 409 (5th Cir. 1955); *Isenberg v. Biddle,* 75 U.S.App.D.C. 100, 102, 125 F.2d 741, 743 (1944). In its counterclaim the government requested that "a declaratory judgment be issued affirming the property right of the United States in the *Atocha,* her tackle, armament, apparel and cargo." (A. 10). While no basis of jurisdiction was stated in the counterclaim regarding the extraterritorial portion of the wreck, the record reveals that the government based its claim to rights in the sunken vessel on the Antiquities Act, 16 U.S.C. § 431 *et seq.,* and the Abandoned Property Act, 40 U.S.C. § 310.[7] The district court thus had jurisdiction under 28 U.S.C. § 1331 to determine the applicability of these statutes to that portion of the vessel situated in international waters.

To summarize, the district court properly adjudicated title to all those objects within its territorial jurisdiction and

---

5. Plaintiffs strenuously argue that in addition to the artifacts seized and brought within the jurisdiction of the court, the vessel itself was *in custodia legis* pursuant to an order of the court. The record lends some support to this contention. On February 26, 1976, the United States moved the court "for an order commanding the United States Marshal for the Southern District of Florida, to arrest and take into custody the defendant vessel, her tackle, apparel, cargo and armament, and to retain the same in his custody until further order of this Court," and, in the alternative, "for an order continuing its order of October 28, 1976 (sic), appointing plaintiffs custodians of the defendant vessel." (A. 88). On October 28, 1975, the court had ordered "that TREASURE SALVORS, INC., and ARMADA RESEARCH CORP. be, and are hereby appointed the custodian of said vessel to retain the same in his [sic] custody for possession and safekeeping for the aforementioned compensation until further order of this court," and had further ordered that "all Marshal's costs be paid prior to the release of said vessel and all further constructive costs be borne by Plain-

tiffs." (A. 51). The Marshal's return filed November 11, 1975, certifies service of a warrant *in rem* upon "The unidentified Wrecked and Abandoned Sailing Vessel . . . Located within 2500 yards of a point at coordinate 24°31.5′ North Latitude and 82°20′ West Longitude, said sailing vessel is believed to be the 'Nuestra Senora de Atocha'." (A. 28).

6. In *The Fairisle,* 76 F.Supp. 27, 34 (D.Maryland), the court held that owners who appeared in an *in rem* action to contest the plaintiffs' claim "may equitably be treated as if they had been brought into court by personal process," citing *The Dictator,* L.R. Probate Division 304 (1892). This view was adopted by the Ninth Circuit in *Mosher v. Tate,* 182 F.2d 475, 479–80 (1950). *See* The Law of Admiralty, *supra* n.3, at 802–05.

7. The government invoked these statutes in its claim of ownership filed in the district court pursuant to admiralty rule 6(c). (A. 6–7).

to those objects without its territory as between plaintiffs and the United States.[8] In affirming the district court, we do not approve that portion of its order which may be construed as a holding that plaintiffs have exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or privies to this litigation.

■ One further procedural matter must detain us. The government asserts that summary judgment was improper in light of two material issues of fact left unresolved by the district court. The first issue, whether the United States has established procedures for the protection and recovery of objects on the outer continental shelf, concerns administrative or legislative action which is subject to judicial notice. *See* Wright and Miller, Fed. Practice and Procedure § 2410. The government was obliged, under Fed.R.Civ.P. 56(e), to set forth any procedures or controlling statutes not already brought to the attention of the court. The government cannot claim to be a party unable, under Fed.R.Civ.P. 56(f), to gather and present material showing the existence of such procedures or statutes.

The second issue, whether plaintiffs were in possession of the *Atocha* and that portion of her tackle, armament, apparel, and cargo which had not been found, cannot be said to be in dispute as a matter of fact. The government adopted plaintiffs' description

of the vessel in its claim of ownership (A. 6). It is uncontested that other artifacts exist in the vicinity of plaintiffs' salvage operation. The government offered no affidavits or other evidence contesting plaintiffs' protection and control of the wreck site. Absent evidence disputing plaintiffs' affidavits, the district court appropriately considered the facts settled on motion for summary judgment.

*Salvage*

The government argues that one of the elements of a salvage action—the existence of a marine peril—is absent from this controversy, and that the district court erred in applying the law of salvage. We believe the government misconstrues both the nature of the law applied by the district court and the law of salvage itself.

■ The *Atocha* is indisputedly an abandoned vessel.[9] Whether salvage law or the adjunct law of finds should be applied to property abandoned at sea is a matter of some dispute.[10] Martin J. Norris, in his treatise on salvage law, states that under salvage law the abandonment of property at sea does not divest the owner of title. M. Norris, The Law of Salvage, § 150 (1958). Courts, however, have rejected the theory that title to such property can never be lost and have applied the law of finds. *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452, 456–57

---

8. On February 19, 1976, the district court entered the following order of final judgment:

 Pursuant to this Court's opinion Order of Summary Judgment of February 2, 1976, it is

 ORDERED and ADJUDGED that judgment be and the same hereby is entered in favor of plaintiffs and against the United States of America and all other claimants. The Counterclaim of the United States of America is hereby dismissed with prejudice.

 It is further ORDERED that plaintiffs, Treasure Salvors, Inc. and Armada Research Corporation, are confirmed in their sole title to, and right to immediate and sole possession of, the vessel identified in this matter as "Nuestra Senora de Atocha "together with all her tackle, armament, apparel and cargo, wherever the same may be found.

 It is further ORDERED and ADJUDGED that no person, organization or governmental

agency shall interfere with the plaintiffs in the lawful exercise of their right to possession or of their salvage rights in the vessel, tackle, armament, apparel and cargo.

 Jurisdiction of this matter is hereby retained for the purpose of enforcement of this Order.

 (A. 86–87).

9. The parties stipulated that "the wreck believed to be the *Nuestra Senora de Atocha,* her tackle, armament, apparel and cargo has been abandoned by its original owners." (A. 69)

10. *See* Eleazer, *The Recovery of Vessels, Aircraft, and Treasure In International Water* 34–35, in Some Current Sea Law Problems, (S. Wurfel ed. 1975) (University of North Carolina Sea Grant Publication No. U.N.C.–SG–75–06).

(E.D.Va.1960). *See Nippon Shosen Kaisha, K.K. v. United States,* 238 F.Supp. 55, 59 (N.D.Cal.1964); *Rickard v. Pringle,* 293 F.Supp. 981, 984 (E.D.N.Y.1968). Under this theory, title to abandoned property vests in the person who reduces that property to his or her possession. In *Rickard,* for example, the court held that title to a propeller recovered from a vessel abandoned on the ocean floor for sixty years vested in "the first finder lawfully and fairly appropriating it and reducing it to possession, with the intention to become its owner." *Id.* at 984, *citing Wiggins, supra, sub nom. The Clythia.*

█ The court below correctly applied the law of finds.[11] Disposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths. The law of salvage does not contemplate a different result. Salvage awards may include the entire derelict property.[12]

█ The government's argument that no marine peril existed ignores the reality of the situation. Marine peril includes more than the threat of storm, fire, or piracy to a vessel in navigation.[13] In *Thompson v. One Anchor and Two Chains,* 221 F. 770, 773 (W.D.Wis.1915), "[t]he 'marine peril' consisted in the fact that the anchors and chains were actually lost. If they had been resting on a reef, where they could be seen, they would undoubtedly have been in 'peril' of being lost, and the 'marine peril' certainly was not diminished or extinguished by the fact that they were actually lost." There is no dispute that the *Atocha*

was lost. Even after discovery of the vessel's location it is still in peril of being lost through the actions of the elements. Thus, under either theory plaintiffs are entitled to award of the property if the government does not prevail in this action.

On this appeal the United States claims the treasure chiefly upon two grounds: (1) Application of the Antiquities Act, 16 U.S.C. §§ 431–433, to objects located on the outer continental shelf of the United States; and (2) The right of the United States, as heir to the sovereign prerogative asserted by the Crown of England, to goods abandoned at sea and found by its citizens. In support of the second contention the government relies not only upon English common law but also upon the Antiquities Act, *supra,* the Abandoned Property Act, 40 U.S.C. § 310, and other generalized statutes and regulations.

*The Antiquities Act*

█ The Antiquities Act authorizes executive designation of historic landmarks, historic and prehistoric structures, and objects of historic or scientific interest situated upon lands owned or controlled by the United States as national monuments. Permission to examine ruins, excavate archaeological sites, and gather objects of antiquity must be sought from the secretary of the department exercising jurisdiction over such lands. As the district court noted, the Antiquities Act applies by its terms only to *lands owned or controlled by the Government of the United States.* The wreck of the *Atocha* rests on the continental shelf,

---

**11.** Norris raises the spectre of violent clashes between competing finders in international waters if abandoned property is held to be a find. Norris, *supra* at § 158 (Supp.1974). We fail to see how salvage law, which gives the right of possession to first salvors, Norris, *supra* at § 152, would provide a more effective deterrent to such clashes. Under either doctrine the property or an award for the value of the salvage efforts goes to the one who is first able to seize possession. The primary difference between the two doctrines is that under salvage law the claim of the finder of abandoned property is satisfied by proceeds from

the sale of the property paid into court. *See* Norris, *supra* at § 156.

**12.** *See Brady v. S.S. African Queen,* 179 F.Supp. 321, 324 (E.D.Va.1960).

**13.** According to Norris, The Law of Salvage § 185 (1958), "[t]he peril required in a salvage service need not necessarily be one of imminent and absolute danger. The property must be in danger, either presently or reasonably to be apprehended." *See Fort Myers Shell & Dredging Co. v. Barge NBC512,* 404 F.2d 137, 139 (5th Cir. 1968).

outside the territorial waters of the United States.[14]

The government asserts that the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq.*, demonstrates Congressional intent to extend the jurisdiction and control of the United States to the outer continental shelf. OCSLA was passed, along with the Submerged Lands Act, 43 U.S.C. § 1301 *et seq.*, to clarify the respective interests of coastal states and the United States in the natural resources of the subsoil and seabed of the continental shelf. A look at the background and interpretation of OCSLA is necessary to determine its scope.

 The Truman proclamation of September 28, 1945,[15] spurred national and international interest in exploitation of the mineral wealth of the oceans. The proclamation asserted the jurisdiction and control of the United States over the mineral resources of the continental shelf, but was not intended to abridge the right of free and unimpeded navigation of waters above the shelf, nor to extend the limits of American territorial waters. *See* 13 Dep't State Bull. 485 (Sept. 30, 1945). The Convention on the Continental Shelf,[16] written thirteen years later, assured to each coastal nation the exclusive right to explore and exploit the resources of the seabed and subsoil, not only of its territorial sea, but also of the adjacent continental shelf beyond the territorial sea. *See* Master's Report, *supra* n.14, at 69.

During the years following the Truman proclamation, intense interest in exploiting ocean resources resulted in disputes between the United States and coastal states asserting jurisdiction over territorial waters. In *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), and its progeny,[17] the United States was held to have rights in the offshore seabed superior to and exclusive of the states. The political reaction to these decisions led to passage of the Submerged Lands Act in May 1953 and the Outer Continental Shelf Lands Act a few months later. *See* 15 Va. J.Int'l. L. 1009, 1011 (1975). By enactment of the Submerged Lands Act, Congress recognized the coastal states' title to and ownership of the lands and natural resources beneath navigable waters within the territorial sea. *See United States v. Maine*, 420 U.S. 515, 525, 95 S.Ct. 1155, 1160, 43 L.Ed.2d 363, 370–71 (1975). In the Outer Continental Shelf Lands Act, "Congress emphatically implemented its view that the United States has paramount rights to the seabed beyond the three-mile limit." *Id.* at 526, 95 S.Ct. at 1161, 43 L.Ed.2d at 371.

---

14. The continental shelf is defined as the seabed and subsoil of the submarine areas adjacent to the coast but outside the area of the territorial sea, to a depth of 200 meters or, beyond that limit, to where the depth of the superjacent waters admits of the exploitation of the natural resources of the said areas. This is a legal, not a geological, definition. The territorial sea of the United States includes those waters lying not more than three miles (or three marine leagues in the Gulf of Mexico in the case of certain Gulf states) from the baseline (the artificial coast line). All parts of the sea not included in the territorial or internal waters of a nation constitute high seas. Nations maintain limited jurisdiction over waters lying not more than twelve miles from the baseline, in order to prevent or punish infringement of customs, fiscal, immigration or sanitary regulations within their territory or territorial sea. This belt of limited control is the contiguous zone. *See generally* Convention on the Continental Shelf, *done* April 29, 1958, [1964] 15 U.S.T. 471, T.I.A.S. No. 5578, in force June 10, 1964; Convention on the Territorial

Sea and the Contiguous Zone, *done* April 29, 1958, [1964] 15 U.S.T. 1606, T.I.A.S. No. 5639, in force Sept. 10, 1964; Convention on the High Seas, *done* April 29, 1958, [1962] 13 U.S.T. 2312, T.I.A.S. No. 5200, in force Sept. 30, 1962; Report of Albert B. Maris, Special Master, *United States v. Maine* 65–68 (No. 35 Original, August 27, 1974) [hereinafter Master's Report]; Note, Marine Archaeology and International Law: Background and Some Suggestions, 9 San Diego L.Rev. 668, 673–77 (1972) [hereinafter Note, Marine Archaeology].

15. Pres.Proc. No. 2667, 10 Fed.Reg. 12303, 59 Stat. 884.

16. Convention on the Continental Shelf, *done* April 29, 1958, [1964] 15 U.S.T. 471, T.I.A.S. No. 5578, in force June 10, 1964.

17. *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950).

The superiority of the federal claim to resources on the outer continental shelf to the claims of the states was clearly established in 1975 in *United States v. Maine, supra.* The United States asserted in its complaint in *Maine* only ". . . sovereign rights over the seabed and subsoil underlying the Atlantic Ocean, lying more than three geographic miles seaward from the coastline to the outer edge of the continental shelf for the purpose of exploring the area and exploiting its natural resources. . . ." Master's Report, *supra* n.14, at 3. The special master found the "basic question involved" in the litigation to be "whether the right to explore and exploit the natural resources of the seabed and subsoil of that portion of the continental shelf . . . belongs to the United States or to the defendant States or any of them." *Id.* at 1. After *Maine,* the primacy of federal over state interests in the natural resources of the outer continental shelf cannot be doubted. But the decision in *Maine* did not address the extent of control by the United States of the shelf in all circumstances.

43 U.S.C. § 1332(a) declares the policy of the United States to be "that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter." Certain language in the Conference Committee report on the bill supports the view that Congress intended to extend the jurisdiction and control of the United States to both the seabed and subsoil.[18] However, this language must be taken in the context of the bill's stated purpose ". . . to amend the Submerged Lands Act in order that the area in the outer Continental Shelf beyond boundaries of the States may be leased and developed by the Federal Government. . . ."[19]

This court held in *Guess v. Read,* 290 F.2d 622, 625 (1961), *cert. denied,* 386 U.S. 957, 82 S.Ct. 394, 7 L.Ed.2d 388 (1962), that "[t]he Continental Shelf Act was enacted for the purpose, primarily, of asserting ownership of and jurisdiction over the minerals in and under the Continental Shelf." The structure of the Act itself, which is basically a guide to the administration and leasing of offshore mineral-producing properties, reinforces this conclusion. The Act consists almost exclusively of specific measures to facilitate exploitation of natural resources on the continental shelf. In addition, 43 U.S.C. § 1332(b) provides that the Act "shall be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to navigation and fishing therein shall not be affected." As the court below noted, an extension of jurisdiction for purposes of controlling the exploitation of the natural resources of the continental shelf is not necessarily an extension of sovereignty.

We believe that a limited construction of the Act comports with the primary purpose of resolving competing claims to ownership of the natural resources of the offshore seabed and subsoil. So read, the Act is consistent with Article 2 of the Convention on the Continental Shelf:

> 1. The coastal state [nation] exercises over the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources.[20]

The Convention on the Continental Shelf was a product of the United Nations Conference on the Law of the Sea convened at Geneva in 1958. It was the result of eight

---

18. ". . . the jurisdiction and control of the United States is extended to the seabed and subsoil of the entire outer Continental Shelf adjacent to the shores of the United States instead of merely to the natural resources of the subsoil and seabed as in the original House version . . . ." Conf.Rep. No. 1031, 83rd Cong., 1st Sess. (1953), *reported at* 2 U.S.Code Cong. & Admin.News 1953, p. 2184.

19. House Report No. 413, 83rd Cong., 1st Sess. (1953), *reported at* 2 U.S.Code Cong. & Admin. News 1953, p. 2177.

20. Natural resources are defined in Article 2 as "the mineral and other non-living resources of the seabed and subsoil together with living organisms belonging to sedentary species. . . ."

years' work by the International Law Commission. *See generally* Neblett, *The 1958 Conference on the Law of the Sea: What was Accomplished*, in The Law of the Sea (L. Alexander ed. 1967). The Convention on the Continental Shelf became effective as law in the United States eleven years after passage of the Outer Continental Shelf Lands Act and superseded any incompatible terminology in the domestic statute. *United States v. Ray*, 423 F.2d 16, 21 (5th Cir. 1970). *See Cook v. United States*, 288 U.S. 102, 118–19, 53 S.Ct. 305, 311, 77 L.Ed. 641, 649–50 (1932).

Interpretations of the Convention and the Act by legal scholars have, with remarkable accord, reached the same conclusion regarding the nature of control of the United States over the continental shelf.[21] The most compelling explication of the Convention regarding national control over non-resource-related material in the shelf area is contained in the comments of the International Law Commission:

> It is clearly understood that the rights in question do not cover objects such as wrecked ships and their cargoes (including bullion) lying on the seabed or covered by the sand of the subsoil.[22]

This comment is consistent with the Commission's general perception of national jurisdiction over the continental shelf:

> [The Commission] was unwilling to accept the sovereignty of the coastal State over the seabed and subsoil of the continental shelf. . . . the text as now adopted leaves no doubt that the rights conferred upon the coastal state cover all rights necessary for and connected with the exploration and exploitation of the natural resources of the continental shelf.[23]

We have demonstrated the limited scope of American control over the wreck site. We conclude that the remains of the *Atocha* are not situated on lands owned or controlled by the United States under the provisions of the Antiquities Act.[24]

### Sovereign Prerogative

The United States also claims the treasure as successor to the prerogative rights of the king of England. At first glance the English prerogative would seem irrelevant to the wreck of a Spanish vessel discovered by American citizens off the coast of Florida. The government contends, however, that the English common law rule—granting the Crown title to abandoned property found at sea and reduced to possession by British subjects[25]—is incorpo-

---

**21.** *See* Perry, *Sovereign Rights in Sunken Treasures*, 7 Land and Natural Resources Division Journal 89, 111–12 (1969); H. Miller, International Law and Marine Archaeology 22, 25–26 (1971) (monograph by Counsel to Subcommittee on Oceans and Atmosphere, Committee on Commerce, United States Senate, published by Academy of Applied Science); Note, Marine Archaeology, 9 San Diego L.Rev. 668, 675, 686, 697 (1972).

**22.** 11 U.S. GAOR, Supp. 9 at 42, U.N. Doc. A/3159 (1956).

**23.** *Id.* In the same vein:
> The Commission accepted the idea that the coastal State may exercise control and jurisdiction over the continental shelf, with the proviso that such control and jurisdiction shall be exercised solely for the purpose of exploiting its resources; and it rejected any claim to sovereignty or jurisdiction over the superjacent waters.

*Id.* at 40.

**24.** We note that even were we to find that the Antiquities Act did cover this salvage opera-

tion, its enforcement provision, 16 U.S.C. § 433, has been held unconstitutionally vague. *United States v. Diaz*, 499 F.2d 113 (9th Cir. 1974).

**25.** The decision in *The Aquila*, 1 C. Rob. 36, 41–42, 165 Eng.Rep. 87, 89 (1798), is often referred to:
> It is certainly very true that property may be so acquired [by finding and possession]: but the question is, to whom is it acquired? By the law of nature, to the individual finder or occupant: But in a state of civil society, although property may be acquired by occupancy, it is not necessarily acquired to the occupant himself; for the positive regulations of the State may have made alterations on the subject; and may, for reasons of public peace and policy, have appropriated it to other persons, as, for instance, to the State itself, or to its grantees.
>
> It will depend, therefore, on the law of each country to determine, whether property so acquired by occupancy, shall accrue to the individual finder, or to the sovereign and his representatives? and I consider it to be the general rule of civilized countries, that what

rated into American law, and that Congress has specifically asserted jurisdiction over the *res* in this dispute.

While it may be within the constitutional power of Congress to take control of wrecked and abandoned property brought to shore by American citizens (or the proceeds derived from its sale), legislation to that effect has never been enacted. The Antiquities Act, which was intended to facilitate preservation of objects of historical importance, could hardly be read to subrogate the United States to the prerogative rights of the Crown. The Abandoned Property Act, 40 U.S.C. § 310, authorizes the administrator of General Services to protect the interests of the government in wrecked, abandoned, or derelict property "being within the jurisdiction of the United States, and which ought to come to the United States." But the Abandoned Property Act has limited application.

In *Russell v. Proceeds of Forty Bales Cotton*, 21 Fed.Cas. No. 12,154, p. 42 (S.D. Fla.1872), the United States intervened and claimed, as its prerogative, the residue of proceeds after a salvage award from the sale of goods found derelict at sea. The government relied upon the predecessor of 40 U.S.C. § 310 [26] as statutory authority for its claim. In a thorough and scholarly opinion, the district court determined that the Act applied only to property which should belong to the United States as a result of its participation in the War between the States.[27] The judgment was affirmed on appeal without opinion, 21 Fed.Cas. p. 50. The court in *United States v. Tyndale*, 116 F. 820 (1st Cir. 1902) presented with the same question,[28] held "[t]he resolution of June 21, 1870 (16 Stat. 380), now section 3755 of the Revised Statutes, relates, apparently, to property which ought equitably to go to the United States, and not to wreckage of any kind." 116 F. at 822.

We accord great weight to the decision in *Russell*, especially since the court was construing legislation then only two years old. However, we believe the less narrow construction accorded the Act in *Tyndale* is more appropriate in light of continued, through infrequent, use of the Abandoned Property Act by the government to regulate salvage of property abandoned on its lands, *Corbino v. United*

is found derelict on the seas, is acquired beneficially for the sovereign, if no owner shall appear. Selden (*De Don. Maris*, lib. i, c. 24) lays it down as a right annexed to sovereignty, and acknowledged amongst all nations ancient and modern. Loccenius (Lib. i, c. 7, 10) mentions it as an incontestable right of sovereignty in the north of Europe. Valin (Lib. iv, tit. 9, art. 26) ascribes the same right to the crown of France . . .. In England this right is as firmly established as any one prerogative of the crown. . . .

**26.** 16 Stat. 380 (1870). The statute originally authorized the Secretary of the Treasury "to make such contracts and provisions as he may deem most advantageous for the interests of the government, for the preservation, sale, or collection, of any property, or the proceeds thereof which may have been wrecked, abandoned, or become derelict, being within the jurisdiction of the United States, and which ought to come to the United States, [and any moneys, dues, and other interests, lately in the possession of or due to the so called Confederate States, or their agents, and now belonging to the United States, which are now held or retained by any person, corporation or municipality whatever, and which ought to have come into the possession and custody of, or been collected or received by, the United States."] The bracketed clause was omitted as obsolete when the statute was codified.

**27.** "The naval and military operations, both of the United States and the so-called Confederate States during the late war, had strewn the harbors of the entire coast with numerous wrecks, and also many portions of the country with abandoned or derelict property, that rightfully 'should come to the United States,' either from being originally the property of the United States, or the property of the public enemy, or from having been engaged in violating the blockade. The continuation of the resolution points more plainly at the fact that in the mind of the legislator the property, dues, and claims 'that ought to come to the United States' through the late war were intended, and no others." 21 Fed.Cas. at p. 43.

**28.** The government intervened in an action by the salvors for the residue of money recovered from a body found at sea. The court had retained the money remaining after payment of a liberal salvage award in its registry for two years. The action in the district court is reported as *Gardner v. Ninety-Nine Gold Coins*, 111 F. 552 (D.Mass.1901).

*States*, 488 F.2d 1008, 203 Ct.Cl. 278 (1973), or property in which it has an equitable claim to ownership, 23 Op.Atty.Gen. 76, 77 (1900) (concerning Spanish vessels lying on Cuban coast, wrecked by naval vessels of United States during Spanish-American War). In any event, the Abandoned Property Act is not a legislative enactment of the sovereign prerogative.[29] Since the United States has no claim of equitable ownership in a Spanish vessel wrecked more than a century before the American Revolution, and the wreck is not "within the jurisdiction of the United States," the Abandoned Property Act has no application to the present controversy. We have considered other statutes and regulations cited by the United States and find no support for the government's position in them.

The government insists that a legislative assertion of the sovereign prerogative is not a necessary prerequisite to the exercise of that jurisdiction by courts of the United States. A number of the royal colonies having asserted certain prerogative rights to abandoned property found within their jurisdiction,[30] the sovereign prerogative is said to have become a part of American maritime law and practice before the Revolution. After the Revolution, according to Kent, "if found at sea, they [wrecks] are supposed to belong now to the United States, as succeeding in this respect, to the prerogative of the English crown."[31]

In spite of the arguments advanced by Chancellor Kent, the notion of sovereign prerogative never took root in America. One early decision, *Peabody v. Proceeds of Twenty-Eight Bags of Cotton*, 19 Fed.Cas. No. 10,869, p. 39 (D.Mass.1829), a veritable treatise on the disposition of derelict property found at sea, concluded that sovereign prerogative had become a part of American maritime law.[32] *Peabody* did not control the decision in *Gardner v. Ninety-Nine Gold Coins*, 111 F. 552 (D.Mass.1901), and it was overruled in *United States v. Tyndale*, 116 F. 820, 822–23 (1st Cir. 1902). The reasoning of that court is impeccable:

> Notwithstanding these propositions, the United States rely on the very learned opinion of Judge Davis in *Peabody v. Proceeds of 28 Bags of Cotton* . . . . The difficulties which we meet were not considered by Judge Davis, the whole force of whose reasoning only leads up to the proposition, which we admit, that it is within the constitutional powers of congress to take control of this fund, and of others like it. The conclusions which he draws from what was said by Mr. Dane and Chancellor Kent are hardly supported by the text of those learned writers. . . .
>
> * * * it is enough to say that, whatever was the title of the king at common law, it was based on the royal prerogative, was appurtenant to the crown, and was, for the most part, classified among the royal revenues. This is fully explained at various points by Blackstone, and by Lord Chief Justice Hale in "De Jure Maris." It is clearly summed up by Hall on the Seashore (2d ed.) 80, as follows:
>
> the laws, customs and principles of jurisprudence, we inherited from our ancestors, and possessed at the period of our becoming an independent nation.")

---

29. *See* Perry, Sovereign Rights in Sunken Treasure, 7 Land and Natural Resources Division Journal 89, 97–104 (1969), for a description of the aforementioned cases. He also cites unpublished Treasury Department memorandum opinions, *e. g.*, Treasury File Op. No. 195, Oct. 16, 1936, construing 40 U.S.C. § 310 to give the United States no authority to claim derelict property in which the United States has no property interest. *Id.* at 102.

30. *See* 2 Kent, Commentaries on American Law 359–60 (5th ed. 1844). *Cf. Thompson v. The Catharina*, 23 Fed.Cas. No. 13,949, pp. 1028, 1030 (D.Pa.1795) ("[T]he change in the form of our government has not abrogated all

31. 2 Kent at 359.

32. However, the court was reluctant to adopt the strict English practice of vesting property absolutely in the sovereign if unclaimed within a year and a day from the decree of salvage. He preferred "to consider the sovereign authority as holding such property in trust, to be surrendered to reasonable claims which may be presented." 19 Fed.Cas. at p. 48.

"In like manner, wreck (when no owner can be found) is part of the king's ordinary revenue, in right of his royal prerogative, and is a flower of the crown. So, also, flotsam, jetsam, and ligan are prerequisites of the crown."

All of these could be granted by the king without authority of parliament. A singular instance of this is given by Dane (volume 3, 137) in reference to the grant of the province of Maine from the King to Sir Ferdinando Gorges. While there can be no question that the sovereign peoples in Anglo-Saxon America, whether the various states or the United States, did, in some way, succeed to all the rights of the English king and of the English people, yet, until some recognized line of procedure or some action of congress intervenes, it is not within the province of the courts to determine that the treasury of the United States represents any particular royal prerogative.

■ Other American cases are in accord with *Tyndale. See Russell v. Proceeds of Forty Bales Cotton*, 21 Fed.Cas. No. 12,154, pp. 42, 45–50 (S.D.Fla.1872), *aff'd* 21 Fed. Cas. p. 50; *In re Moneys in Registry*, 170 F. 470, 475 (E.D.Pa.1909); *Thompson v. United States*, 62 Ct.Cl. 516, 524 (1926). Although at least one state court has invoked English common law to award ownership of a sunken vessel to the sovereign,[33] the "American rule" vesting title in the finder has been widely recognized by courts and writers. *See* Kenny and Hrussoff, *The Ownership of the Treasures of the Sea*, 9 Wm. & Mary L.Rev. 383, 392–98 (1967).[34] *See also* H.

Miller, International Law and Marine Archaeology 18 (1971). We accept the "American rule" as it has been uniformly pronounced in the courts of this nation for over a century.[35]

■ Finally, the United States asserts a generalized power to control the activities of its citizens and corporations beyond the limits of territorial jurisdiction. While this power no doubt exists,[36] we can find no authority in law or in reason to countenance interference with plaintiffs' activities simply because they are American citizens, or because they chose to incorporate in Florida rather than in some other country.

The judgment is modified and as modified is AFFIRMED.

---

**33.** *Ervin v. Massachusetts Co.*, 95 So.2d 902 (Fla.1956), *cert. denied*, 355 U.S. 881, 78 S.Ct. 147, 2 L.Ed.2d 112 (1957).

**34.** ". . . [I]t is somewhat difficult to assess the place of *State ex rel. Ervin v. Massachusetts Co.* in American law. In any event, in the federal courts it remains the settled rule that, after the original owner, the finder's claim is preferred to the sovereign's." *Id.* at 398.

**35.** Eleazer, *supra* n. 10, at 34, reaches the following conclusion concerning the applicable rules:

The nations of the world fall into two groups, generally speaking, as regards the ownership of recovered treasure. For the sake of clari-

ty, the first group will be said to adhere to the English Rule—recovered treasure belongs to the sovereign. The second group adheres to the American Rule—recovered treasure belongs to the finder. The crucial characteristic to note is that title to recovered treasure vests in either the sovereign or the finder. (footnote omitted)

**36.** We are cited to the controls over American fishermen on the high seas, including the North Pacific Fisheries Act, 16 U.S.C. § 1021 *et seq.*, the Northwest Atlantic Fisheries Act, 16 U.S.C. § 981 *et seq.*, and the Tuna Conventions Act, 16 U.S.C. § 951 *et seq.*